A03A0042. THOMAS v. THE STATE.
A03A0043. HUNNICUTT v. THE STATE.
(589 SE2d 243)

SMITH, Chief Judge.

Rose Marie Thomas and Greg Hunnicutt were each convicted of two counts of cruelty to children and six counts of aggravated battery. Following the denial of their amended motions for new trial, they appeal. We find the evidence sufficient to support the jury's verdicts. But because we agree with both appellants that they were erroneously denied the right to open and close final argument under OCGA § 17-8-71 and because we cannot conclude that the error was harmless, we are constrained to reverse and remand this case for a new trial.

1. Hunnicutt and Thomas challenge the sufficiency of the evidence. Thomas argues very generally that the evidence was insufficient to show that both she and Hunnicutt injured the victim. Hunnicutt complains only of his conviction with respect to one count of cruelty to children; he argues that the evidence was insufficient to show that he failed to obtain necessary medical treatment for the victim. He raises no argument with respect to the sufficiency of the evidence on the remaining counts.

On appeal, we view the evidence in the light most favorable to support the jury's verdict, and a defendant no longer enjoys the presumption of innocence. *Chung v. State*, 240 Ga. App. 394 (1) (523 SE2d 615) (1999). This court neither weighs the evidence nor deter-

mines witness credibility, and we are bound to uphold the jury's verdict "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Cits.]" Id. at 394-395.

Viewed in this light, the record shows that Rose Marie Thomas, Greg Hunnicutt, and the seven-week-old victim lived in the home of Hunnicutt's parents. Thomas was the victim's mother, and presumably Hunnicutt was her father.[1] Eight other people lived in the house: Hunnicutt's parents, Frank and Judy Hunnicutt; Hunnicutt's sister, Pamela McCants; and Pamela's husband and children, Keith, Troy, Krystal, James, and Matthew McCants, respectively.[2] On the morning of January 19, 1997, Pamela McCants observed that "something was wrong" with the victim while Thomas was holding her. The victim's arms and legs were limp and appeared to be lifeless. The victim was transported by ambulance to the hospital, where doctors discovered severe and catastrophic injuries to her head, ribs, and legs.

On the night before the victim was hospitalized for these injuries, Hunnicutt, Thomas, and all six members of the McCants family played a video game in the bedroom shared by Hunnicutt, Thomas, and the victim. The victim was also present. Between 8:00 and 9:00 p.m., the four McCants children went to bed, and Keith McCants left the house to visit with friends. Frank and Judy Hunnicutt left the house as well and returned sometime later. After talking with Hunnicutt and Thomas for a short time, Pamela McCants went to bed around 10:00 or 11:00 p.m. in the basement, leaving Hunnicutt, Thomas, and the victim in Hunnicutt's bedroom.

McCants testified that the victim, who generally was not a fussy baby, "was kind of quiet" and did not "seem like her usual self" that night. On cross-examination, she also testified that the baby "was just unusually quiet, not really playful or smiling. When you touched her she would cry. . . . [A]ll that week she had been more fussy than she usually was."

McCants saw no bruises or abrasions on the baby that night, however, nor did she notice any swelling, and she testified that when she left the bedroom, the victim "seemed fine." She did not see the victim again until the next morning, when she lay limp in Thomas's arms. Abundant evidence was presented concerning both defendants' complacent, unconcerned demeanor after they learned the extent of the victim's injuries.

---

[1] Hunnicutt told the police that he did not know whether the victim was in fact his child, but he testified at trial that he also "told them that it didn't matter if she was mine or not that I accept her as my daughter."

[2] Troy, Krystal, James, and Matthew were ages fourteen, thirteen, eleven, and five, respectively.

The evidence of the defendants' guilt is wholly circumstantial. And

> [i]n determining the sufficiency of the circumstantial evidence to support a conviction of cruelty to a child (or to withstand a motion for a new trial), the trial court as well as this court will apply a "reasonable hypothesis rule." This is to say that a conviction based solely upon circumstantial evidence must be supported by facts which not only are consistent with guilt of the accused, but should exclude every reasonable hypothesis save that of the guilt of the accused. This does not mean that the state must exclude every possible hypothesis showing innocence, but any reasonable hypothesis showing innocence. The yardstick by which we determine what in a given case is a reasonable hypothesis is in the first instance a question for the jury. Thus, except where the guilty verdict is unsupportable as a matter of law, this court will not substitute its judgment as to what is a reasonable hypothesis for that of the jury or the trial court.

(Citation omitted.) *Chung*, supra at 395-396. Mere presence at the scene of a crime is insufficient to show that a defendant is a party to the crime, but criminal intent can be inferred "upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted." (Citation omitted.) *Dunn v. State*, 238 Ga. App. 579, 580 (519 SE2d 503) (1999).

The defendants advanced a number of theories at trial concerning the source of the victim's injuries: a fall from atop a tall chest of drawers; injury from other violent family members; and injuries caused by CPR. The State, however, presented evidence that neither a fall from five or six feet nor CPR would have caused the devastating injuries suffered by the victim. It is undisputed that the defendants were the victim's primary caretakers, and it appears that they were the only people who were in the same room with the victim between the time the other family members left her bedroom and the time she appeared limp and almost lifeless the next morning.

Some evidence was also presented that a few days before the victim was hospitalized, Thomas showed Hunnicutt and other family members a lump on the victim's head, but they did not seem concerned. Here, medical testimony concerning the extent and possible cause of the victim's injuries, evidence of the defendants' complacent demeanor, and testimony concerning their access to the victim were but some of the factors from which the jury was authorized to determine their guilt. The trial court fully charged the jury on the State's burden of proof, the definition of circumstantial evidence, parties to a

crime, and the fact that presence alone provided insufficient evidence to authorize a conviction. Whether the State's evidence excluded every reasonable possibility save the defendants' guilt was particularly a question for the jury, and we cannot say that the jury's verdict is "unsupportable as a matter of law." *Chung*, supra at 396.

2. Both appellants contend they were erroneously denied the right to open and close final arguments. The trial court found that defense counsel essentially introduced evidence when counsel "quoted directly from . . . witnesses who weren't here." The court particularly emphasized the cross-examination of one of the State's witnesses, Sergeant Robert McGee, and concluded that appellants had lost their right to open and conclude final arguments.

Under OCGA § 17-8-71, if a defendant does not introduce evidence, his or her counsel has the right to open and conclude argument to the jury after the State's evidence is closed. In *Smith v. State*, 272 Ga. 874 (536 SE2d 514) (2000), the Supreme Court of Georgia articulated standards to be applied in determining whether a defendant has lost this right. If, during cross-examination, a defendant reads portions of a witness's prior written statement unrelated to impeachment, the defendant has effectively introduced evidence that should have been formally offered into evidence, and the defendant loses the right to open and close final arguments. Id. at 878 (3). Conversely, if the defendant reads only portions of the prior statement relevant to impeachment, "the defendant has not introduced evidence and does not lose the right to open and close." Id.

The Supreme Court of Georgia revisited and reaffirmed this analysis in *Lane v. State*, 274 Ga. 751 (559 SE2d 455) (2002). In *Lane*, on cross-examination, defense counsel had a police officer read one question and one answer from his prior testimony, as well as the oath contained on the report signed by him. Id. at 753. The Supreme Court concluded that defense counsel did not introduce evidence but simply cast doubt on the officer's credibility, under the second standard articulated in *Smith*, supra. *Lane*, supra at 753. Because the trial court erroneously denied Lane his right to open and close final argument and because the evidence of Lane's guilt was not overwhelming, the Supreme Court concluded that Lane was entitled to a new trial. Id.

In his attempt to determine the cause of the victim's injuries, McGee interviewed both defendants, as well as other members of the victim's family. On direct examination, he testified concerning Hunnicutt's description of his own activities on the morning of January 19, just before the victim was taken to the hospital. In addition, McGee testified that during one interview with Hunnicutt, he suggested "three options, three scenarios" to Hunnicutt, "just trying to grab at anything, hoping he would offer some reason or some legiti-

mate reason of what might have happened to the baby." From among these suggestions, Hunnicutt "picked the floor . . . [a]s one of the methods that the injury may have occurred." McGee testified that shortly after Hunnicutt chose this "option," McGee told Hunnicutt that he believed Hunnicutt had harmed the victim. According to McGee, a brief period of silence followed, and Hunnicutt smiled slightly, leaned back, and said, " 'I could see how you think that.' "

On cross-examination, as on direct examination, McGee testified that Hunnicutt told him he woke up around 9:00 a.m., turned on his bath water, went downstairs to get the newspaper, heard the victim "make a noise," and went back upstairs to the bedroom to check on her. Noting on cross-examination that "this is one of the things that's changed," McGee referred to his report and testified that after Hunnicutt returned to his bedroom, Hunnicutt told Thomas "something was wrong with the baby." Defense counsel then read the following short portion of McGee's report: "[I]n your report you say, 'On Sunday morning he went to the bathroom to run the bath water, he then went downstairs to get the newspaper. Greg said he remembers the baby making a noise and he came back into the room and he told Rose something.' Is that right?" McGee responded affirmatively, and defense counsel recited, "And then the next sentence, 'Greg said that he might have taken the child out of the room, but does not think he did so.' " McGee again responded in the affirmative, stating that he had questioned Hunnicutt as to whether he had taken the baby with him at some point, "just to establish that the baby had left the room."

This very short exchange on cross-examination concerning Hunnicutt's activities on January 19 demonstrated at least a slight inconsistency between McGee's testimony and his written report. On one hand, according to McGee's testimony, Hunnicutt told Thomas something was wrong with the victim. On the other, McGee's written report simply recited that Hunnicutt went upstairs and "told Rose something." McGee's testimony contradicted Thomas's statement to an investigating officer that *she* first noticed the baby's uncharacteristic behavior and first told Hunnicutt that the baby had a problem. The brief questions on cross-examination were an effort to discredit McGee's testimony by showing a discrepancy between his trial testimony and his police report. Under the circumstances of this case, we must conclude that the use of McGee's report in this manner was not the equivalent of the introduction of evidence requiring a formal tender. Rather, defense counsel simply attempted "to cast doubt on the officer's recollection and credibility," *Lane,* supra at 753, and Thomas and Hunnicutt did not lose the right to open and close final argument as a result of this short series of questions.

Defense counsel also brought out an inconsistency between McGee's direct testimony and his testimony on cross-examination.

On direct examination, McGee testified that Hunnicutt "picked" one of the three scenarios suggested by McGee as to the manner in which the victim may have been injured. Defense counsel questioned McGee about McGee's instructions to Hunnicutt during the interview to "pick one of the three." McGee's direct testimony implied that Hunnicutt simply volunteered the information that the baby might have been injured by blows or by a fall to the floor, after being presented with the three possibilities. But defense counsel showed on cross-examination that McGee actually *told* Hunnicutt to choose one of the three scenarios. Again, we agree with Hunnicutt that the questions asked of McGee about the interview simply served to cast doubt on his credibility and did not constitute the introduction of evidence forfeiting his right to open and close final argument. The questions were "relevant to impeaching the witness, which is the essence of the second standard enunciated in *Smith*." *Lane*, supra at 753.

The State also argues that "[c]lose examination of the transcript reveals" other instances "of the defense highlighting non-impeaching information from prior statements and reports." In an attempt to implicate other family members in the crime, namely Keith and Troy McCants, defense counsel did refer to and direct witnesses to certain Department of Family and Children Services and police reports. But although these reports were mentioned, they were not read into evidence. The State argues that "the reference to and display of" such documents "implied the existence of evidence favorable to Hunnicutt" and served as a basis for concluding that both defendants forfeited the right to open and close final argument.

We do not agree. A defendant does not lose "the right to make opening and closing final arguments by testifying about a document or statement without showing it to the jury or by cross-examining a witness." (Footnote omitted.) *Kennebrew v. State*, 267 Ga. 400, 404 (4) (480 SE2d 1) (1996). Mere cross-examination of a witness does not constitute the introduction of evidence divesting a defendant of this right. Id. at 404, n. 2. Rather, a defendant is precluded "from presenting evidence to the jury and retaining the right to open and close final arguments simply by failing or refusing to make a formal motion for the introduction of such evidence. . . . Whether through a defendant's own statement, or under the guise of cross-examination, a defendant cannot be permitted to present evidence to the jury which should otherwise be formally offered." (Citation omitted.) Id. at 404. Here, neither defense counsel nor the witnesses actually read the reports or statements complained of by the State into evidence. Compare id. at 403 (entire recorded statement played for jury); *Harrison v. State*, 251 Ga. App. 302, 303 (1) (553 SE2d 343) (2001) (witness read into evidence portions of defendant's statement unrelated to impeachment).

Hunnicutt and Thomas did not present documentary evidence requiring a formal tender, and the trial court therefore erred in depriving them of the right to open and conclude final argument. As in *Lane*, supra, "[a]lthough this Court has held such an error harmless where the evidence demands a verdict of guilty, the evidence in the present case, though adequate to support the conviction[s], is not so overwhelming as to demand a guilty verdict." (Citation omitted.) Id. at 753. Consequently, Hunnicutt and Thomas are entitled to a new trial.

3. Because it is an issue likely to recur on retrial, we address Hunnicutt's argument that the trial court erroneously admitted his statement to McGee. During a *Jackson-Denno* hearing, McGee testified that Hunnicutt was not under arrest at the time of the interview, that Hunnicutt was not prevented from leaving the interview, and that Hunnicutt was neither promised anything in return for a statement nor threatened into making the statement. On cross-examination, McGee acknowledged that he told Thomas's attorney in another proceeding that he was "trying to gather enough evidence to put them in jail." The trial court found that Hunnicutt was not under arrest when he made the statement and therefore that *Miranda* warnings were not required.

Apparently based on McGee's testimony that he was trying to gather evidence sufficient to arrest Hunnicutt at the time of the interview, Hunnicutt argues that the trial court erroneously admitted his statement. But a statement is not inadmissible simply because an interviewing officer harbors a "secret intention of charging the suspect at a future time." (Footnote omitted.) *Taylor v. State*, 259 Ga. App. 457, 459 (576 SE2d 916) (2003). Instead, although a court must examine all circumstances surrounding the interrogation in deciding whether a suspect is in custody for *Miranda* purposes, "the ultimate inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." (Footnote omitted.) Id. Hunnicutt clearly "was not in custody when the questioning occurred, nor would a reasonable person in [Hunnicutt's] position have understood the situation to constitute a restraint on his freedom of movement of the degree which the law associates with a formal arrest." (Footnote omitted.) Id. The trial court therefore did not err in admitting Hunnicutt's statement on the ground that *Miranda* warnings were not required.

4. In light of our holding in Division 2, we need not reach the appellants' remaining enumerations of error.

*Judgments reversed. Ruffin, P. J., and Miller, J., concur.*

DECIDED JULY 10, 2003 —
RECONSIDERATION DENIED JULY 25, 2003 — 

*Sidney L. Storesund*, for appellant (case no. A03A0042).

*Novy, James & Vaughan, Eugene Novy, Deborah M. Vaughan*, for appellant (case no. A03A0043).

*Patrick H. Head, District Attorney, C. Lance Cross, Amy H. McChesney, Frances D. Hakes, Assistant District Attorneys*, for appellee.