A04A1733, A04A1734. EDWARDS v. THE STATE (two cases).
(612 SE2d 868)

BARNES, Judge.

Although Stephanie Edwards was indicted for murder, two counts of felony murder, two counts of aggravated assault, and one count of cruelty to children, a jury convicted her only of the lesser included offense of involuntary manslaughter for the death of her two-month-old daughter. Edwards appeals, citing several enumerations of error. Because we find that the evidence was insufficient to support Edwards' conviction for involuntary manslaughter, we reverse Case No. A04A1733. However, we find no abuse of discretion in the trial court's denial of Edwards' motion for appeal bond, and affirm Case No. A04A1734.

Viewed in the light most favorable to the verdict, the evidence showed that Edwards and her co-defendant, the child's father, Angelo Tate, lived together and had a two-month-old daughter. Edwards' nine-year-old daughter also lived with the couple. The nine-year-old was not home the weekend of the incident in question. Edwards was

---

[14] See *Midland Ins. Co. v. West*, 175 Ga. App. 419, 422 (2) (333 SE2d 628) (1985).

a social worker, who had previously worked for the Department of Family and Children Services. On April 14, 2004, at approximately 2:15 p.m., Edwards telephoned 911 and reported that her daughter was not breathing. When emergency personnel arrived at the home, they discovered the infant on a changing table in full arrest. Edwards and the co-defendant argued in the hallway while the EMTs attempted to resuscitate the infant. One of the EMTs reported that Edwards said to the co-defendant, "You killed my baby."

The EMTs successfully resuscitated the baby and transferred her to a local hospital, and, because of the seriousness of her injuries, she was life-flighted to Egleston Children's Hospital. The forensic pediatrician who evaluated the baby while she was hospitalized diagnosed her with a "severe head injury that was inflicted by someone else due to shaking alone, very violently, or possibly shaking a child with a head impacting a soft surface that would not leave a bruise." The baby was unresponsive and on a ventilator until after a second brain death examination was performed, then she was pronounced brain dead. Edwards and the baby's father were arrested and charged with the baby's death.

The father testified that he got up at "five or six o'clock" Sunday morning to feed the baby. He said that the child would not take her bottle Sunday morning, but seemed fine otherwise. The father later said that he had accidentally dropped his daughter Saturday night, and did not tell Edwards about it until they were on the way to the hospital. He said that he and Edwards had taken the child shopping on Saturday, and when they came home, he put the infant, who was still in her car seat, on the changing table, and she subsequently fell out because the safety strap was unfastened.

Edwards said that she saw the baby Saturday night at around 10:30 when she went in to help the father with the baby. She said that the baby was covered with milk because the father said that the bottle had burst while he was feeding her. Edwards said she changed the baby's diaper and milk-soiled clothing. On Sunday morning she woke up at about 10:00, and when Edwards asked the father if the baby had awakened and had a bottle, he answered that the baby had not taken her bottle. Edwards bathed, dressed, and went to the grocery store to pick up some items to prepare breakfast, and to the pharmacy. Edwards testified that when she peeked in on the child after she returned from the store around 12:30 p.m., her boyfriend was in the baby's room, and she noticed that her daughter's eyes were "rolling around a little bit in her head." She thought that the baby was just tired since they had returned from an out-of-town visit four days earlier. She testified that she had seen the baby's eyes roll back like that before when she was "nodding off" and "trying to go to sleep." Edwards prepared and ate breakfast, laid down with the father for

about 20 minutes, then went in to check on her daughter. When she went into the room she heard her daughter make a "gurgling noise or a burp," and when she picked her up, the child appeared lifeless. She testified that her boyfriend first told her that he had dropped the baby when they were driving to the hospital.

When police searched the home they found a wet diaper in the diaper pail. It appeared to contain a small bloody spot. They also recovered linen and baby clothing soiled with what appeared to be vomit. The medical examiner testified that there was a small bruise on the top of the baby's scalp, and that it was "possible that an impact to the head in that area, the same impact that caused that bruise could have caused the injuries to the brain that eventually resulted in the baby's death." He also testified that it was unlikely that the fall as described by the father caused the head injuries even though it may have caused the bruise. He stated that he could not conclusively distinguish whether the head injury was caused by shaking or blunt force injury, and that although he would favor "the shaking as playing a significant role," he could not exclude the possibility of head trauma. The medical examiner concluded that no more than six hours could have elapsed between the incident that caused the infant's symptoms and the time she was discovered. All of the doctors agreed that the symptoms of shaken baby syndrome would progress rapidly and show outwardly in the child's appearance. The injury would produce "a reduced level of consciousness, potential seizure activity, potential vomiting, limp, limp arms and legs, a listless child." The pediatric emergency room doctor who initially treated the baby when she arrived at the hospital testified that the baby's rectal temperature was in the "low 90's, 91 or 92" when she arrived. He testified that the "dramatically low temperature" indicated that "the condition had been present for a time period before she got to the emergency room."

The State argued that Edwards was guilty of involuntary manslaughter based on one of two theories; either she committed the crime, or the father killed the child and Edwards helped him conceal the death and intentionally delayed seeking medical attention. To support these theories the State maintained that the evidence shows that Edwards and the co-defendant were both at home with the baby except for the time Edwards went to the store, the baby's clothing that Edwards said she had changed was soiled with vomit, not milk, and that Edwards claimed that she immediately called 911 when she discovered her injured child, but that the call appeared to have been made later.

*Case No. A04A1733*

1. Under OCGA § 16-5-3 (b), a person commits the crime of involuntary manslaughter when he causes the death of another without any intention to do so, by committing a lawful act in an unlawful manner likely to cause death or great bodily harm. And, "[a]lthough mere presence at the scene of the crime is insufficient grounds for a conviction, a person can be guilty as a party to the crime if they intentionally aid, abet, encourage, facilitate, assist, or are otherwise concerned in the commission of the acts that constitute the crime." *Glenn v. State*, 278 Ga. 291, 294 (1) (b) (602 SE2d 577) (2004). Furthermore, since the State's case against Edwards was based entirely upon circumstantial evidence, "the law is clear that unless the State's evidence excludes every reasonable hypothesis except that of [Edwards'] guilt, it has failed to carry its burden to establish guilt beyond a reasonable doubt." *Johnson v. State*, 269 Ga. 840, 842 (506 SE2d 374) (1998). This means that the State must offer evidence that is inconsistent with Edwards' hypothesis of innocence, and if it fails to do so the resulting conviction cannot be sustained under the law.

> The term "hypothesis" as used in OCGA § 24-4-6 refers to such reasonable inferences as are ordinarily drawn by ordinary men in the light of their experience in everyday life; the Code section does not mean that the act might by bare possibility have been done by somebody else, but that the State should show to a moral certainty that it was the defendant's act.

(Citation and punctuation omitted.) *Cobb v. State*, 195 Ga. App. 429, 430 (2) (393 SE2d 723) (1990).

The State appears to ground its case on several factors including the fact that "only the parents had access to their baby," Edwards' demeanor, which it deemed "suspect," her belligerence during the investigation, and that Edwards' representation that she had no contact with her baby Saturday night "defied common sense."

Yet it is uncontested that Edwards had no significant contact with her baby until the time that she called the 911 operator. Moreover, although the father asserted that he had done nothing to harm the baby, he admitted that Edwards had no significant contact with the baby during this time period, and that their arrangement was that Edwards would take care of the baby during the week, and he would have the primary responsibility for the baby during the weekend.

The State maintains that this case is comparable to *Thomas v. State*, 262 Ga. App. 492, 494 (1) (589 SE2d 243) (2003), where we found that the circumstantial evidence, showing that the defendants were the victim's primary caretakers and the only people in the victim's room between the time others last saw her and the time she appeared almost lifeless the next morning, was sufficient to sustain the defendants' convictions for cruelty to children and aggravated battery.

Here, unlike *Thomas*, Edwards was not the primary caretaker of the child, nor was it established that she was the last person to have access to her baby before the child's injury. The State appears to assert that Edwards' mere presence in the home was enough to support its equal access theory. In *Johnson v. State*, supra, 269 Ga. 840, evidence was presented that

> (1) on the night of the murder, Johnson was downstairs in the apartment; (2) on the night of the murder, two other adults — the baby's mother and her boyfriend — were upstairs in the apartment, with the baby; (3) Johnson called 911 to report that the baby was not breathing; (4) neighbors heard Johnson say he "did not do it," and observed him acting upset; (5) Johnson denied knowledge about the murder, and offered no help to investigators; and (6) someone, acting alone or in concert with someone else, removed the crib from the apartment. There also was some evidence to suggest that, on one previous occasion, Johnson and others had observed [a co-defendant] toss the infant in the air, causing the baby to vomit.

Id. at 841-842.

In reversing Johnson's conviction for felony murder, our Supreme Court held that there was no

> circumstantial evidence from which the jury could infer that Johnson mistreated the baby. It was shown only that Johnson was present in the apartment on the night of the murder, denied having committed the murder, called 911, and failed to assist in the police investigation. Since Johnson was heard saying "I didn't do it" roughly two hours before the 911 emergency call was made, it might be inferred that he failed to call 911 immediately after learning that the baby had been harmed. While it also might be inferred that he withheld relevant information from investigators, such conduct, while culpable, provides no basis for reasonable persons to conclude beyond a reasonable doubt that Johnson was guilty

of bludgeoning the baby, causing its death.

*Johnson v. State*, supra, 269 Ga. at 842.

Likewise in *Glenn v. State*, 278 Ga. 291 (602 SE2d 577) (2004), the defendant was convicted of two counts of felony murder, two counts of cruelty to children in the first degree, and aggravated battery for her involvement in the death of her three-week-old baby. The State had argued that the defendant "was concerned in the commission of those acts even if she did not commit them directly." Id. at 294 (1) (b). The evidence showed that Glenn and her boyfriend lived together with her baby. On the night before the baby was injured, Glenn left the baby in her boyfriend's care while she went to sleep for the night. Early the next morning her boyfriend woke her up to tell her that the baby was having trouble breathing. The State presented evidence that Glenn allowed the boyfriend to care for the baby even though she knew that her boyfriend might possibly have earlier hurt the baby, and that she was not cooperative at the hospital.

In reversing her conviction for felony murder, cruelty to children, and aggravated battery, the Supreme Court held that "the State failed to exclude the reasonable hypothesis that [the boyfriend] injured the baby while Glenn slept unaware in another room in the house, and that Glenn failed to participate in the emergency room discussion because she did not know what had caused [the baby] to stop breathing." *Glenn v. State*, supra, 278 Ga. at 294 (1) (b).

Here, as in *Johnson* and *Glenn*, the State's case is based entirely on circumstantial evidence, "and the law is clear that unless the State's evidence excludes every reasonable hypothesis except that of [Edwards'] guilt, it has failed to carry its burden to establish guilt beyond a reasonable doubt." *Johnson v. State*, supra, 269 Ga. at 842. Based on the evidence, it is reasonable to conclude that, per the arrangement of Edwards and the father, on the night and day in question the father had the primary responsibility for the baby's care. It is also possible to hypothesize that whatever injury occurred to the baby, occurred during this period, and that Edwards was completely unaware that anything had happened to the baby until she discovered the child immediately before her 911 call. There is no evidence

> to dispel the reasonable possibility that during this time, [Edwards] . . . had no knowledge of the attack on the baby until after it was over. Nor is there any evidence to suggest that [Edwards] had previously inflicted harm upon the baby, or had been a party to such abuse. The State offered nothing to discount the reasonable possibility that [Edwards] did not contribute to the baby's death, other than [her] presence in the [home during that time]. [Edwards'] mere presence at

the scene . . . , without anything more, is not an adequate basis to support [her] conviction for that crime.

Id. at 843.

Accordingly, we reverse Edwards' involuntary manslaughter conviction.

### Case No. A04A1734

2. In this appeal, Edwards contends that the trial court erred in denying her motion for bond pending her appeal. The decision to grant or refuse to grant bail in noncapital felony cases after conviction is a matter that lies within the sound discretion of the trial court; we will not disturb that discretion unless it has been abused. *Williams v. State*, 228 Ga. App. 289, 290 (2) (491 SE2d 500) (1997).

In this circumstance, Edwards lost the presumption of innocence, and bore the burden of convincing the judge to grant an appeal bond. *Abernathy v. State*, 245 Ga. App. 857, 858 (539 SE2d 203) (2000). In exercising its discretion,

the trial court must answer four questions: (1) whether there is a substantial risk the defendant will flee; (2) whether there is a substantial risk the defendant will pose a danger to others in the community; (3) whether there is a substantial risk the defendant will intimidate witnesses or otherwise interfere with the administration of justice; and (4) whether it appears the appeal is frivolous or taken only for delay.

*Knapp v. State*, 223 Ga. App. 267, 268-269 (477 SE2d 621) (1996). "Thus, the trial court should not grant bond pending appeal unless the defendant presents sufficient information, evidence, or argument to convince the trial court that none of the four factors applies." *Abernathy v. State*, supra, 245 Ga. App. at 858.

Here, in denying the motion for the appeal bond, the trial court found that because Edwards had few ties with this State, there was a risk that she would flee if released on bond. Because there was evidence presented at the hearing regarding Edwards' lack of ties to the community, and substantial ties out of state, the trial court did not abuse its discretion by denying Edwards' motion for an appeal bond.

*Judgment reversed in Case No. A04A1733. Judgment affirmed in Case No. A04A1734. Blackburn, P. J., and Mikell, J., concur in judgment only.*

DECIDED MARCH 29, 2005.

*Brian Steel*, for appellant.

*Patrick H. Head, District Attorney, Amy H. McChesney, Eleanor A. Dixon, Dana J. Norman, Assistant District Attorneys*, for appellee.