A05A0299. HOOD v. THE STATE.
(615 SE2d 244)

MIKELL, Judge.

A jury convicted Jerry Lee Hood of cruelty to children, OCGA § 16-5-70 (b), and aggravated battery, OCGA § 16-5-24, for shaking his one-month-old daughter so violently that serious brain injury resulted. The two offenses merged, and the trial court sentenced Hood to twenty years confinement. After the denial of his motion for a new trial, Hood filed the present appeal, in which he challenges the sufficiency of the evidence and argues that the trial court erred in denying his motion for a mistrial and in excluding certain hearsay evidence. We affirm.

---

[10] See generally *Riley v. State*, 268 Ga. 640, 642 (2) (d) (491 SE2d 802) (1997).
[11] See id.; *Reynolds*, supra.

On appeal from a criminal conviction, the evidence is viewed in the light most favorable to the verdict, and the defendant no longer enjoys the presumption of innocence. *Thomas v. State*, 262 Ga. App. 492 (1) (589 SE2d 243) (2003). We do not weigh the evidence or determine witness credibility but only determine whether the evidence is sufficient under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Thomas*, supra at 493.

So viewed, the evidence shows that Hood and his girlfriend, April Louise Watson, were the parents of a one-month-old daughter, S. W. From the date of the child's birth, December 25, 1998, until the date of the crime, January 30, 1999, the couple and their child lived with April's father, James Olson Watson. Several other family members also resided on the property.

April and her father left home between 10:00 and 11:00 a.m. on January 30, 1999, to visit a nearby flea market. Hood agreed to take care of S. W. while April was away. April and James were gone for approximately five hours and arrived at home around 3:00 p.m. Immediately upon their return, April realized that something was wrong with S. W. She testified that the baby's eyes "just rolled in the back of her head, and she was just shaking." James gave a similar description of S. W.'s condition in his testimony. Hood offered no explanation for the change in the infant's condition. April and Hood rushed S. W. to a local hospital. After the infant was stabilized, she was transported by ambulance to the newborn intensive care unit at the Medical College of Georgia (the "MCG") hospital in Augusta.

Dr. Robert Frederick Boedy, a neonatologist at the MCG, testified that when S. W. was admitted, she was unconscious and connected to a breathing machine. He explained that there was significant swelling in her brain and described her condition as being in a coma. Dr. Boedy testified at length regarding the numerous tests performed and the very serious nature of S. W.'s injuries, including multiple sites of bleeding in her brain, a possible left adrenal gland hemorrhage, a chest contusion, a left parietal skull hemorrhage, strokes on both sides of her brain, and fractures of two bones in her left leg. Dr. Boedy testified that S. W. had bruising on her chest and corresponding lung contusions consistent with an adult finger and thumb holding the child by the chest. According to Dr. Boedy, he began to suspect "shaken baby syndrome" during the examination. He explained that when a baby is vigorously shaken, it can result in the veins from the skull to the brain being torn by the sudden acceleration and deceleration and in the carotid arteries being blocked, producing a stroke. Dr. Boedy testified that it would have required "[b]ig-time force" to create the injuries observed in S. W. According to Dr. Boedy,

the trauma causing S. W.'s brain injuries had been inflicted within the four-hour period prior to her admission to the hospital. He further testified that S. W.'s injuries were not accidental ones that could have been caused by a fall or somehow have been self-inflicted.

Dr. Steven Brooks, the head of pediatric ophthalmology at the MCG, testified that he was asked to examine S. W. to rule out eye injuries that might be associated with shaken baby syndrome. He determined that S. W. had widely distributed hemorrhages in both retinas, as well as "very dramatic swelling throughout the retina and around the optic nerve," which were symptoms of shaken baby syndrome. Dr. Brooks further testified that blood tests ruled out other potential causes of the eye injuries. Both Dr. Brooks and Dr. Boedy concluded that S. W. had shaken baby syndrome. Dr. Boedy testified that the child's prognosis was grave: "She will be able to do nothing. She will be a child who will simply eat, sleep and excrete and that's it."

The evidence demonstrates that Hood was the only person in contact with S. W. during the four-hour time period in which the brain injuries were inflicted. A tape recording of Hood's voluntary statement to a Richmond County Sheriff's Department investigator was played for the jury at trial. In that statement, Hood told the investigator the following: that he was with S. W. all day; that there were other people in the house, but he never saw them come into contact with S. W.; that if anyone had touched the baby, Hood would have heard her cry; that S. W. had been healthy before the day in question; and that he never saw April, James, or anyone else shake S. W. Approximately 30 minutes after giving the first statement, Hood amended it to add that it was possible that he shook S. W. too hard while playing with her.

The jury also heard evidence concerning Hood's demeanor at the hospital. Dr. Boedy testified that when he spoke to April and Hood, he made particular note of his observation that "[Hood] was unusually placid and had to be prodded to provide comfort to the infant's mother."

1. In his first enumerated error, Hood challenges the sufficiency of the circumstantial evidence. We find that the above summarized evidence provided ample support for the jury's verdict on both counts and affirm.

OCGA § 16-5-70 (b) provides: "Any person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain." Aggravated battery is committed when a person "maliciously causes bodily harm to another . . . by rendering a member of his or her body useless." OCGA § 16-5-24 (a).

In determining the sufficiency of the circumstantial evidence to support a conviction of cruelty to a child (or to withstand a motion for a new trial), the trial court as well as this [C]ourt will apply a "reasonable hypothesis rule." This is to say that a conviction based solely upon circumstantial evidence must be supported by facts which not only are consistent with guilt of the accused, but should exclude every reasonable hypothesis save that of the guilt of the accused. This does not mean that the state must exclude every possible hypothesis showing innocence, but any reasonable hypothesis showing innocence. The yardstick by which we determine what in a given case is a reasonable hypothesis is in the first instance a question for the jury. Thus, except where the guilty verdict is unsupportable as a matter of law, this [C]ourt will not substitute its judgment as to what is a reasonable hypothesis for that of the jury or the trial court.

*Chung v. State*, 240 Ga. App. 394, 395-396 (1) (523 SE2d 615) (1999), citing *Robinson v. State*, 168 Ga. App. 569, 570-571 (1) (309 SE2d 845) (1983). Accord *Thomas*, supra at 494 (1); *Thompson v. State*, 262 Ga. App. 17, 18 (1) (585 SE2d 125) (2003).

Bearing the above standard in mind, we find sufficient evidentiary support for the jury's verdict. It is undisputed that Hood was S. W.'s primary caregiver during the four-hour time period in which medical evidence indicated that the injuries were inflicted, and he admitted in his statement that he was the only person who came into contact with the infant during that time. See *Morris v. State*, 202 Ga. App. 673, 674 (415 SE2d 485) (1992) (jury authorized to infer that defendant caused child's injuries when he admitted being the only person present when they occurred). Further, evidence of Hood's detached, complacent demeanor at the hospital, medical testimony concerning the extent and likely cause of S. W.'s injuries, the fact that S. W.'s condition changed dramatically during the time she was in her father's care, and the lack of contact with the child by others residing in the home were other factors from which the jury could determine Hood's guilt. See *Thomas*, supra; *Chung*, supra at 396. Accordingly, "[w]hether the State's evidence excluded every reasonable possibility save [Hood's] guilt was particularly a question for the jury, and we cannot say that the jury's verdict is unsupportable as a matter of law." (Citation and punctuation omitted.) *Thomas*, supra at 495.

2. Next, Hood contends that the trial court erred in denying his motion for a mistrial after two jurors on a lunch break might have seen him in handcuffs getting into a van outside the courthouse. The record shows that the state suggested that the court give a curative

instruction to the jury, but the defense declined such an instruction. The defense also declined the court's offer to interview the two jurors to determine if they even saw the defendant. This enumerated error is without merit.

"Absent justifying circumstances, the defendant normally should not be seen by the jury handcuffed in the courtroom or courthouse. However, where one or more jurors by chance see the defendant in handcuffs outside the courtroom, it is not error to deny a motion for mistrial." (Citation and punctuation omitted.) *Robinson v. State*, 164 Ga. App. 379, 380 (2) (296 SE2d 225) (1982). We find no abuse of discretion based on the record before us.

3. Finally, Hood argues that the trial court erred by excluding a third party's admission against penal interest which he contends would have exculpated him. On the state's motion, the trial court excluded a portion of the testimony of Brittany New, who had been involved in a sexual relationship with Hood and remained in contact with him after his incarceration, in which she testified that April told her that April, not Hood, had shaken S. W. It bears noting that April testified at trial, and the defense did not ask about her conversation with New.

The law on this subject is clear:

> Georgia does not recognize a *third party's* admission against penal interest, when that admission exculpates the defendant: It is the long-standing rule in this state that declarations to third persons against the declarant's penal interest, to the effect that the declarant, and not the accused, was the actual perpetrator of the offense, are not admissible in favor of the accused at his trial.

(Punctuation omitted; emphasis in original.) *McCulley v. State*, 273 Ga. 40, 42 (2) (b) (537 SE2d 340) (2000), citing *Timberlake v. State*, 246 Ga. 488, 492 (1) (271 SE2d 792) (1980) and *Turner v. State*, 216 Ga. App. 896, 899 (2) (456 SE2d 241) (1995). Accord *Corn v. State*, 256 Ga. App. 364, 365 (3) (568 SE2d 583) (2002). Further, one of the two underlying reasons for any exception to the hearsay rule is the necessity of the otherwise inadmissible hearsay evidence. *Turner*, supra at 898 (2). In this case, the declarant was available and did testify. The trial court properly excluded April's purported admission to New.

*Judgment affirmed. Andrews, P. J., and Phipps, J., concur.*

DECIDED MAY 25, 2005.

*Randolph Frails*, for appellant.

Jerry L. Hood, *pro se*.

*Daniel J. Craig, District Attorney, Charles R. Sheppard, Assistant District Attorney*, for appellee.