## A11A1823. STROZIER v. THE STATE.

(723 SE2d 39)

ADAMS, Judge.

Wade Douglas Strozier appeals the denial of his motion for new trial in connection with his conviction on one count of possession of

drugs by an inmate.[1] He asserts that the trial court erred in denying his motion because the evidence was insufficient to support his conviction. We agree and reverse.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict, and the defendant no longer enjoys the presumption of innocence. *Thomas v. State*, 262 Ga. App. 492, 492-493 (1) (589 SE2d 243) (2003). The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Collinsworth v. State*, 276 Ga. App. 58, 59 (622 SE2d 419) (2005).

On February 16, 2004, Strozier was an inmate in Dooly State Prison. That day, another inmate, James Pinkins, Jr., was assigned to clean up inside the administration area and visitation lobby at the prison, while Strozier had the duty of maintaining the area outside. As a part of his duties, Pinkins was removing cigarette butts from an ash tray above a cylindrical trash can, which was positioned outside the visitation lobby to accommodate smokers (the "Lobby Trash Can"). After removing the cigarette butts from the tray, he noticed a white plastic grocery bag inside the cylindrical container under the tray. Thinking that it was a dirty diaper, he picked it up and put it in the bag he used to collect the cigarette butts. When the white bag dropped against the cement sidewalk, however, "it sounded hard like a plate or something." Concerned that something may have broken, Pinkins retrieved the white bag, opened it and looked inside where he observed something that "looked like some drugs" sitting on top of other items. Pinkins closed the bag, put it back in the Lobby Trash Can, and went inside to retrieve a deputy warden to report what he saw. Finding that the deputy wardens were in a meeting, he returned to his duties and started washing dishes. When Captain Antwan Caldwell exited the meeting, Pinkins told him about the white bag and proceeded to show him. As Pinkins opened the door to the outside, he saw Strozier getting the bag out of the Lobby Trash Can. He told Caldwell, "it's too late now sir, he has got it."

Caldwell testified that Pinkins was ahead of him at the door. When Caldwell got to the door, he looked out and Strozier was the

---

[1] Under OCGA § 42-5-18 (c),
[i]t shall be unlawful for an inmate to possess a gun, pistol, or any other weapon; any intoxicating liquor; amphetamines, biphetamines, or any other hallucinogenic drugs or other drugs, regardless of the amount; a telecommunications device; or any other item without the authorization of the warden or superintendent or his or her designee.

only person he saw. In fact, Strozier was the only inmate authorized to be in that outside area. He was standing on a grassy area near another building holding an empty trash bag. Strozier was not near the Lobby Trash Can at that point, and Caldwell did not see Strozier handle the white bag. Caldwell stepped around Pinkins to inspect the Lobby Trash Can and found it was empty. Caldwell told Pinkins to go inside, and Caldwell stepped back inside to summon another officer, Sergeant Michael Williams. When Caldwell went inside to use the radio, he lost sight of Strozier and did not see him again until Williams and he stepped back outside approximately three to five minutes later.

The officers escorted Strozier to the I. D. building and summoned officers from the Correctional Emergency Response Team to conduct a strip search. In the meantime, Caldwell searched a big metal trash can outside the I. D. building (the "I. D. Trash Can") and discovered a white grocery bag tied at the top. Caldwell removed the bag from the I. D. Trash Can, and Williams and he took it to the warden's office. There, they opened the bag and found six smaller plastic bags wrapped in black tape and containing marijuana. They also discovered a cell phone and a phone adapter in the bag.

Caldwell testified that emptying the bottom portion of the Lobby Trash Can was not within Pinkins's duties, which were confined to removing the cigarette butts from the top. Emptying the trash can was the duty of whoever worked outside. All trash from outside the prison, including the trash in the I. D. Trash Can, was taken up to the vehicle gate for later pickup and thus did not come back inside the prison building.

Williams testified that Strozier had the duty that day of emptying trash from both cans, but the proper procedure was for Strozier to take the trash from one can and place it directly by the gate for pickup. He should not have taken the trash from one can and placed it in the other. In fact, Strozier would have to pass the gate to get to the I. D. Trash Can from the Lobby Trash Can. Caldwell acknowledged, however, that Strozier could have put trash he had picked up from the Lobby Trash Can into the I. D. Trash Can. Additionally, both Caldwell and Williams testified that Strozier was strip searched each time he left his work detail.

Strozier denied any knowledge of the marijuana as reflected in the statement he gave at the time of the incident, which read in pertinent part:

> My job is to keep the front of the institution clean and looking neat. I took the trash out of the trash bin in front of the visitation area as normal and placed in the larger trash can behind I. D. As to what was in the trash, I don't know,

nor who it belongs to. I don't take the time to look through the trash before I dispose of it. As to anything else, I don't have a clue as to what is going on.

The evidence further showed that anyone coming in and out of the prison had access to the area where the Lobby Trash Can was located, including all prison employees and any visitors. In fact, the prison had visitation the weekend before the discovery of the marijuana, on Saturday and Sunday, February 14 and 15, but the trash cans were not emptied until Pinkins and Strozier came on duty Monday morning, February 16.

The State also presented the testimony of Carla Denise Brown, who testified that in February 2004, her boyfriend was Jeremy Johnson, an inmate at Dooly State Prison. In order to reduce the cost to her of Johnson's collect phone calls from prison, Brown agreed to buy Johnson a cell phone and gave it to his friend Jay Rivers to take to the prison.[2] She identified the cell phone from the white bag as the phone she bought for Johnson. Brown testified that she did not know Strozier and never heard Johnson discuss Strozier. The State presented no evidence of any connection between Strozier and Johnson. In fact, Strozier and Johnson were housed on opposite sides of the prison — with Strozier in the east side dormitories, and Johnson in the west side dormitories — although all inmates had the opportunity to intermingle at times.

Strozier argues that this circumstantial evidence was insufficient to support his conviction because it failed to exclude every reasonable hypothesis except that of his guilt.

Questions as to the reasonableness of hypotheses are generally to be decided by the jury which heard the evidence and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law.

(Citations and punctuation omitted.) *Rogers v. State*, 290 Ga. 18, 23 (717 SE2d 629) (2011).

To prove the charge against Strozier, the State was required to show that he possessed the drugs with the requisite criminal intent.

---

[2] Johnson and Rivers were both co-defendants at Strozier's trial.

Thus,

> the State was required to show some connection between [Strozier] and the drugs other than spatial proximity. In fact, the State was required to show that [Strozier] knowingly had both the power and intention at a given time to exercise control over the drugs. Power may be inferred from access to the drugs, while the matter of intent may be derived from the surrounding circumstances. Circumstances showing an intent to exercise control over the drugs include a defendant's attempts to flee or elude police; inconsistent explanations by the defendant for [his] behavior; the presence of significant amounts of contraband and drug paraphernalia in plain view; the defendant's possession of large amounts of cash, other indicia of the sale of drugs, or drug-related paraphernalia; evidence that the defendant was under the influence of drugs; or drug residue found on the defendant.

(Citations, punctuation and footnotes omitted.) *Scott v. State*, 305 Ga. App. 596, 598 (699 SE2d 894) (2010).

The State failed to show any such incriminating circumstances in this case. The evidence showed that any employee or visitor who passed through the area could have placed the bag in the Lobby Trash Can. Although Pinkins testified, and Strozier admitted, that he removed the white bag from the Lobby Trash Can and put it in the I. D. Trash Can, it was Strozier's job to empty those trash cans. Even if Strozier violated jail procedure when he took the plastic grocery bag to the I. D. Trash Can instead of the gate, no evidence existed that Strozier ever opened the bag or knew what was inside. The State failed to present any evidence to support even an inference that Strozier had any prior knowledge of the drugs or any idea of what was in the bag. To the contrary, the evidence showed that the phone in the bag was purchased by someone who had no connection with Strozier other than the fact that her boyfriend, Johnson, was also one of approximately 1,200 other inmates at the same prison. The State established no connection between Strozier and Johnson, nor did the prosecution present any evidence showing that Strozier had any connection with drugs while in prison. For example, no evidence was presented from the strip search of Strozier that day. And nothing in the surrounding circumstances supports an inference that Strozier intended to do anything other than simply discard the bag and its contents. The contents of that I. D. Trash Can were slated to be removed from the prison along with the other trash. There was no indication that Strozier planned to get the contents of the bag

inside the prison. He placed the drugs in a trash can to which no other inmate had access, and Strozier knew that he would be strip searched when he went back inside. Thus, the State failed to prove anything against Strozier other than a violation of prison procedure for disposing of trash, but such a violation alone is insufficient to support Strozier's conviction.

Accordingly, the State failed to demonstrate that Strozier had the bag in his possession for any reason other than the performance of his assigned duties and thus failed to exclude the reasonable hypothesis that Strozier was merely performing his job that morning when he removed the bag from one trash can and placed it in the other. We, therefore, reverse his conviction for possession of drugs by an inmate. See *Rogers v. State*, 302 Ga. App. 65, 69 (1) (690 SE2d 437) (2010) (conviction reversed where only legal evidence linking defendant to marijuana was his spatial proximity to it); *Millsaps v. State*, 300 Ga. App. 383, 385-386 (685 SE2d 371) (2009) (evidence insufficient where state offered no evidence that defendant knew that the baggy under his seat contained contraband or that he hid the contraband). Compare *Collinsworth v. State*, 276 Ga. App. at 60 (affirming conviction for possession of drugs by an inmate where marijuana found in inmate's cell); *Webb v. State*, 249 Ga. App. 214, 216 (1) (547 SE2d 767) (2001) (same where marijuana found in container belonging to inmate in locker, which opened only with warden's master key or combination known only to inmate).

*Judgment reversed. Barnes, P. J., and Blackwell, J., concur.*

DECIDED JANUARY 31, 2012.

*Rashawn D. Clark*, for appellant.
*Denise D. Fachini, District Attorney, Matthew P. Brown, Assistant District Attorney*, for appellee.

