301 Ga. 445
FINAL COPY



S17A0265.  GOMEZ v. THE STATE.
S17A0266.  HUITRON v. THE STATE.


NAHMIAS, Justice.

Appellants Margarita Gomez and Alejandro Martinez Huitron challenge

their convictions for felony murder and other crimes related to injuries to and

the resulting death of their three-year-old daughter, Esmerelda.  We vacate three

of each Appellant's convictions (Counts 4, 11, and 16) to correct sentencing

errors, but we reject Appellants' many other contentions and affirm their

remaining convictions.[1]

---

[1] On May 31, 2010, Esmerelda suffered a severe skull fracture and other injuries.  She died three days later.  On June 15, 2011, a Clayton County grand jury indicted Gomez and Huitron for malice murder, three counts of felony murder, four counts of aggravated battery, two counts of aggravated assault, one felony count of contributing to the deprivation of a minor resulting in death, and six counts of first degree cruelty to a child, all with Esmerelda as the victim.  Gomez was also indicted for two misdemeanor counts of contributing to the deprivation of a minor for abandoning her son Joseph.  The State later nolle prossed one aggravated battery count and one child cruelty count.  At a trial from October 29 to November 2, 2012, the jury found Gomez and Huitron guilty of two counts of felony murder (based on aggravated assault with an unknown object and contributing to the deprivation of a minor), the two counts of aggravated assault, the felony count of contributing to the deprivation of a minor, two counts of first degree child cruelty, and two charges of second degree child cruelty as a lesser included offense.  Gomez was also found guilty of another lesser included charge of second degree child cruelty (based on fracturing Esmerelda's ribs) and both counts of contributing to the deprivation of Joseph.  Gomez and Huitron were found not guilty of the remaining charges.  The trial court sentenced Gomez and Huitron to two terms of life imprisonment without the possibility of parole on the two felony murder counts.  They were also

1.      Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following.  On May 31, 2010, Gomez and Huitron spent the day at their apartment in Forest Park with their two daughters, Esmerelda and two-year-old Perla.  Joseph, Gomez's younger son by another man, did not live with them.  Around 8:00 p.m., Esmerelda suffered a severe head injury, resulting in a skull fracture and brain and retinal hemorrhaging.  After Appellants called 911, Esmerelda was taken to Hughes Spalding Children's Hospital and later flown to Egleston Hospital, where she died on June 3.

Gomez and Huitron were interviewed separately several times by officers from the Forest Park Police Department, first on the night of Esmerelda's

sentenced to twenty years for aggravated assault using hands, twenty years for first degree cruelty to children, and ten years for second degree cruelty to children.  Gomez was sentenced to an additional ten years for her additional second degree cruelty to children conviction and two years for her two misdemeanor convictions for contributing to the deprivation of Joseph.  As discussed in Division 4 below, Appellants' convictions and sentences for felony murder based on felony contributing to the deprivation of a minor should have been vacated and the aggravated assault and second degree child cruelty counts for which they were sentenced should have been merged.

Gomez filed a timely motion for new trial, which she then amended with new counsel.  Huitron filed a timely motion for new trial with new counsel, which he then amended.  The trial court held evidentiary hearings on July 8 and November 9, 2015, and then denied the motions in one order on December 11, 2015.  Gomez and Huitron filed timely notices of appeal, and the cases were docketed in this Court for the term beginning in December 2016 and submitted for decision on the briefs.

injuries, again a few days later, and finally on June 10, when they each participated in a re-enactment of how they supposedly found Esmerelda. Each time, a Spanish-speaking police officer or interpreter was used.[2] Initially, Gomez and Huitron both said that when Esmerelda was injured, they were washing dishes or about to start washing dishes together in their kitchen while the two girls were playing in the back bedroom. They heard a scream from one of the girls and ran to the bedroom. In another version given later by Gomez, Huitron was on the back patio grilling and she was in the kitchen when they heard the scream.

Both parents claimed that they found Esmerelda lying on her back on the floor between a small child's table and one of the two beds in the room.[3] According to Gomez, Esmerelda looked as if she was struggling to speak or get up, but then she fainted. According to Huitron, Esmerelda was unconscious and having trouble breathing, with a small amount of blood on her face. They moved Esmerelda into the living room, and one or both of the parents performed

---

[2] Testimony at trial indicated that Gomez and Huitron did not speak English well, although Huitron understood some.

[3] The bed was 25 inches high, and the table had two child-sized metal chairs at it. At the re-enactment, both Appellants claimed that one of the chairs was knocked over, but each Appellant picked a different chair.

CPR while an ambulance was called. Gomez then carried Esmerelda out to wait for the ambulance. Both parents claimed that they did not see what caused Esmerelda's injuries but hypothesized that she had fallen while jumping on the bed, because she liked to play on the bed. Dr. Jordan Greenbaum, who was the medical director of the Center for Safe and Healthy Children at Children's Healthcare of Atlanta and had been called to consult on Esmerelda's case at Egleston because the treating doctors suspected child abuse, called Gomez on June 2 to get a medical history for Esmerelda. The doctor asked Gomez specifically about a big bruise Esmerelda had on her abdomen, which Gomez attributed to the child hitting herself on furniture. Dr. Greenbaum, who noticed numerous bruises on Esmerelda's belly, also asked Gomez if she could think of any injuries she had seen on Esmerelda's skin and Gomez said she could recall only one bruise; she had not noticed any other bruising.

The next day, Officer Karen Henry, who was assigned to investigate in Esmerelda's case because she specialized in child abuse cases, interviewed Gomez. Gomez said that she never saw any bruises or marks on Esmerelda, that the only other injury Esmerelda had suffered was eight days earlier when she fell in the bathtub, and that Esmerelda had fallen out of bed while sleeping but

4

had not injured herself. Officer Henry testified, however, that the pictures she saw of Esmerelda showed bruises on the side of her abdomen, from her armpit to her diaper area, that had begun to heal.

When examining Appellants' apartment about three hours after the 911 call, investigators found clumps of dark hair in the bathroom and outside, one to two feet from the concrete patio.[4] They also found spots of dry blood on the floor in the front bedroom, in the hallway between the bathroom and bedrooms, and on the floor in the back bedroom. The swabbings taken from these spots matched Esmerelda's DNA. Several officers testified that the apartment was very neat, including the kitchen and back bedroom, and the beds looked like they had recently been made; although the comforter on one of the beds looked a little disheveled, that was not the bed next to which the parents said they found Esmerelda.

At trial, four medical experts testified for the State. Dr. Amita Shroff, who treated Esmerelda at Hughes Spalding and was qualified as an expert in pediatric emergency medicine, testified that Esmerelda had a "Battle's sign" —

---

[4] A police officer described the hair as human, but it appears that the hair was never tested to determine if it was human or to match it to the victim. Pictures of the hair were admitted at trial.

bruising on the side of her face, behind her ear, and tracking down her neck — which indicates a skull fracture, and fixed and dilated pupils, which indicate brain damage. She also had blood in her ear and on her nose, as well as bruises on her nose, chin, back, and abdomen. The child's abdomen was distended and she had an abrasion on her left flank. The doctor testified that there was no way a fall from a bed could have caused these injuries; they could be caused only by something traumatic like a car accident, falling off a 15-to-20 story building, or having her head slammed onto a hard object like concrete or a bathtub.

Dr. Rajamani Iyer testified that she was Esmerelda's pediatrician, and at all her visits, including the last visit four weeks before the incident, Esmerelda seemed normal. A year before trial, the prosecutor had shown Dr. Iyer an autopsy photograph of Esmerelda's head, and Dr. Iyer, who was qualified as an expert in pediatric medicine, testified based on that photograph that Esmerelda's injuries were not consistent with a fall from the bed and looked like child abuse. Dr. Iyer also testified that the injuries could have been caused by a chair, concrete, or other hard object.

Dr. Greenbaum, who was qualified as an expert in forensic pathology and child abuse medicine, also was present at the re-enactment. Dr. Greenbaum

testified that Esmerelda had a complex Y-shaped skull fracture and subdural and sub-retinal hemorrhages. She explained that the sub-retinal hemorrhaging was so severe that it could only be caused by a few things, including major head trauma and leukemia (and there was no evidence that Esmerelda had leukemia). Dr. Greenbaum further explained that Esmerelda's injuries involved high acceleration and deceleration forces of the sort seen in a high-speed car accident, a fall from three or more stories, or by a person much bigger than Esmerelda slamming her head on the floor. Dr. Greenbaum also testified that Esmerelda had numerous injuries to her torso and two rib fractures which had begun to heal, meaning they were at least seven to ten days old. Dr. Greenbaum concluded from all of this information that Esmerelda's injuries were caused by abuse.

The State's final witness was Dr. Lora Darrisaw, the GBI medical examiner who performed Esmerelda's autopsy and who was qualified as an expert in forensic pathology and pediatric forensic pathology. Dr. Darrisaw testified about scattered bruises on the child's body, including a collection on the right side of her body and one on her jaw, which would normally be seen after forceful grabbing of the head; although it was possible, but not likely, that

7

the bruise on Esmerelda's chin was caused by medical intervention, none of the other bruises could have been. She added that Esmerelda's neck had been "impacted," meaning it had been hyperextended over a curved surface or the corner of a hard object. Dr. Darrisaw, who was also present at the re-enactment by Appellants, examined the chairs in the bedroom and concluded that even though they were metal, they were small, fold-up chairs that could not have caused the injuries. The doctor testified that Esmerelda's injuries could have been caused only by "[h]er head hit[ting] something very, very hard that doesn't move," so the doctor could not see how Esmerelda could have sustained her injuries by falling on anything in the bedroom; the only surface that seemed consistent with the injuries was the concrete patio outside the apartment. Dr. Darrisaw explained that Esmerelda's neck injuries and the bleeding in her eyes indicated that she was moving fast, which could be caused by her falling from a height greater than her own or someone picking her up and moving her body with a lot of force before she impacted a surface. Dr. Darrisaw also noted that there was a build-up of iron in Esmerelda's brain, indicating that she had suffered an earlier head injury. Dr. Darrisaw ruled the cause of death to be blunt force trauma and concluded that it was non-accidental.

8

Several witnesses testified about the relationship between Esmerelda and her parents. An officer who talked to Gomez at the hospital on the night Esmerelda was taken there testified that Gomez cried briefly when she was told that Esmerelda might die. Another officer, who spoke to Gomez later that night, testified that when he told her that Esmerelda might die, she said she believed that Esmerelda would be okay, but she started crying when he told her that she would not be able to take her other daughter, Perla, home.

Joanna Duarte, one of Gomez's friends, testified that Gomez had said Esmerelda was the "product of a rape" and that Gomez sent the child to Mexico when she was ten or eleven months old. Around November 2009, when Esmerelda was about three, Gomez asked Duarte to go get her and bring her back. Esmerelda had lice when she returned, and when Duarte gave Esmerelda to Gomez, she offered to get Gomez a prescription for lice shampoo. Instead, Gomez shaved off all of Esmerelda's hair to prevent the lice from spreading to Perla. Duarte testified that Gomez always showed Perla more affection, saying that Perla was prettier because she looked like Huitron and calling Esmerelda ugly. Duarte also observed that Esmerelda did not seem very attached to her mother and whenever Esmerelda saw Duarte, she would say she wanted to go

9

with Duarte. Ana Maldonado, who sometimes cared for the children, testified to the child having a similarly strained relationship with Huitron, who worked in Columbus, Georgia during the week. On one occasion, Maldonado dropped Esmerelda off with him, and when he grabbed her, Esmerelda reacted in a way that indicated she did not want to be left with him.

A caseworker with the Babies Can't Wait program of the Georgia Department of Health testified that when she came to do an evaluation of Gomez's son, Joseph, in November 2009, Joseph and Esmerelda looked malnourished, and Esmerelda was dressed in torn clothes and looked small for her age and frightened. This prompted the caseworker to make a referral for Esmerelda, as well as Joseph, to receive services from Babies Can't Wait, but when the caseworker tried to follow up with Gomez, her contact numbers had been disconnected and she had moved.

The caseworker was later able to track down Joseph, discovering that he was living with Maldonado and looked healthy and happy. Testimony showed that Gomez gave Joseph, who was born around July 2009 and was not Huitron's son, to her friend Duarte's sister around October 2009. The sister cared for Joseph for about five months, during which time Gomez did not visit or provide

any money for her child. The sister eventually returned Joseph to Gomez because she had four kids of her own and was having money problems. On March 8, 2010, Gomez gave Joseph to Maldonado, and Gomez signed a notarized agreement that she would leave Joseph in Maldonado's custody permanently. Gomez told Maldonado that Joseph was sick and she could not take care of him.[5] Maldonado also understood that Huitron did not want Joseph in his home.[6]

Gomez and Huitron did not testify at trial or call any witnesses. The defense theory for both Appellants was that Esmerelda had been injured in an accident. The jury rejected that theory and found Appellants guilty of felony murder and other charges. See footnote 1 above.

<u>The Motions for New Trial</u>

2. After their convictions, Gomez and Huitron filed motions for new trial. Over the course of the two hearings on the motions, each Appellant

---

[5] The caseworker testified that Joseph had some developmental delays and had been diagnosed with another condition, but it later turned out "that he didn't have any other medical problems." Maldonado testified that Joseph "had the condition of apnea. It's a machinery that monitors the beating of his heart." And Gomez told a police officer that Joseph had respiratory problems.

[6] Although Huitron first lied to the police and said that at the time of Esmerelda's injuries, Joseph was with a babysitter, he eventually admitted that Gomez had given Joseph to Maldonado.

11

presented a medical expert. Huitron called Dr. Brian Frist, a retired medical examiner from Cobb County, who was qualified by the trial court as an expert in medical examination and anatomic and clinical pathology, but not in forensic pathology because he was not board-certified in that area. Dr. Frist acknowledged that Esmerelda's injuries could have been inflicted intentionally, but claimed that there was no way to determine whether they were caused intentionally or accidentally. He disagreed with the State's experts who had testified that the injuries required a fall from at least two stories and said the injuries could have been caused by Esmerelda's falling from about two feet and hitting her head on one of the objects in the room, such as the chairs (although he admitted that was unlikely), the bedframe, or the table (assuming it was hard). Dr. Frist also said that he did not think the injuries were caused by Esmerelda's head striking the patio because that would have caused an indentation in her skull that he did not see.

Gomez called Dr. Adel Shaker, a medical examiner for a Texas county who formerly worked for a county in Mississippi. The trial court qualified Dr. Shaker as an expert in anatomic, clinical, and forensic pathology. He, too, acknowledged that he could not exclude intentional blunt force trauma as the

12

cause of the injuries, but he also disagreed with Dr. Darrisaw's conclusion that Esmerelda's injuries likely resulted from hitting her head on the concrete patio, because he did not see any fracture or dislocation of neck vertebrae and there was no blood on the patio. Dr. Shaker testified that jumping on the bed and falling on a metal chair could have caused Esmerelda's body to spin and her neck to overextend, resulting in the hemorrhaging that she had. Like Dr. Frist, he disagreed with the State's experts who had testified that a fall from two to fifteen stories was required, and he asserted that if a child jumped to five feet in height and hit her head on the floor or a hard object, that could have caused the injuries. Dr. Shaker also claimed that Esmerelda's injuries could have been caused by a seizure.

Dr. Shaker was cross-examined about a Tennessee case in which he testified for the defense. Like Esmerelda, the child victim in that case suffered retinal hemorrhaging and swelling of the brain. Dr. Shaker testified that those injuries were caused by tuberous sclerosis. An expert on tuberous sclerosis, however, testified that the child's injuries looked nothing like tubers, and Dr. Shaker's former supervisor in Mississippi traveled to Tennessee to testify contrary to Dr. Shaker without taking payment because he was "appalled" by

13

Dr. Shaker's testimony.[7]

Huitron's and Gomez's trial lawyers, who were both experienced criminal defense attorneys, also testified during the hearings. They each said that their main defense strategy at trial was to argue that the cause of Esmerelda's injuries was an accident, and, to some extent, to try to deflect blame onto their client's co-defendant. They also explained that they conducted limited investigations into whether they could find an expert to usefully support the accident theory. Gomez's counsel interviewed Dr. Darrisaw about the injuries, consulted with a biomechanics mathematician at Georgia State University, and educated himself by reading books on the subject. After doing so, counsel "did not think that the numbers were going to break [his] way." He was concerned that any expert witness's testimony would be more helpful to the State than to his client and would prevent him from pursuing an accident defense. Similarly, Huitron's counsel spoke with a medical school instructor from the University of Georgia, who said that it "didn't sound likely" that Esmerelda's injuries were caused by a fall from a bed and referred counsel to a study on skull injuries, which counsel

---

[7] Dr. Shaker also acknowledged his involvement in a high-profile case involving the death of a United Kingdom citizen in Kenya where his boss modified the autopsy report, as well as a case of a possible lynching in Mississippi where the family did not want him involved.

14

read. Counsel's research into the subject led him to conclude that Appellants' story was "extremely unlikely."

The trial court denied the motions for new trial, and these appeals followed.

Sufficiency of the Evidence

3.    Appellants both argue that the evidence was legally insufficient to support their convictions under Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979), and that the evidence was circumstantial and did not "exclude every other reasonable hypothesis save that of the guilt of the accused" as required by former OCGA § 24-4-6.[8] When viewed in the light most favorable to the verdicts, the extremity of Esmerelda's injuries on May 31, 2010, which the State's multiple experts testified were not consistent with Appellants' not-quite-matching accounts of the injuries as an accident; the fact that Appellants, Esmerelda's parents, were the only adults in the apartment when the child was injured; and the evidence of Esmerelda's prior injuries, sufficiently supported the jury's findings of guilt beyond a reasonable doubt on

---

[8] This case was tried in 2012, before Georgia's new Evidence Code took effect. Former OCGA § 24-4-6 is now found at OCGA § 24-14-6. Oddly and unhelpfully, the parties have all cited mostly new Evidence Code provisions in the portions of their briefs discussing evidentiary issues.

15

the charges related to her injuries on May 31 and her resulting death three days later. See Jackson, 443 U. S. at 319; Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)). See also OCGA § 16-2-20 (defining parties to a crime); Johnson v. State, 269 Ga. 632, 634 (501 SE2d 815) (1998) ("A participant to a crime may be convicted for the crime although he or she is not the person who directly commits the crime."); Thomas v. State, 262 Ga. App. 492, 493-494 (589 SE2d 243) (2003). The jury also was authorized to reject as unreasonable Appellants' hypothesis that Esmerelda injured herself in an accident. See Jones v. State, 299 Ga. 377, 379-380 (788 SE2d 477) (2016).

Gomez also challenges her conviction for second degree cruelty to children for fracturing Esmerelda's ribs between December 24, 2009 and May 31, 2010. The offense of cruelty to children in the second degree is committed when a person "with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (c). The evidence showed that from November 2009 until Esmerelda's fatal injuries, the child lived with Gomez and Huitron. Although Huitron worked outside the

16

home, there was no evidence that Gomez did or that Esmerelda was routinely cared for by anyone else. And the evidence was clear that Gomez and Huitron were the only adults with Esmerelda when she suffered the fatal injuries to her head, supporting the inference that the rib fractures were part of a pattern of ongoing abuse by, at least in part, Gomez, which culminated in the child's death.

Furthermore, when Gomez was asked by Dr. Greenbaum about a large bruise on Esmerelda's abdomen, Gomez said she hit herself on furniture, and Gomez claimed to recall seeing only one bruise. When Officer Henry interviewed Gomez three days after Esmerelda's fatal injuries, Gomez again said she had not seen any bruises or marks on the child, but she said that Esmerelda fell in the bathtub eight days earlier. Both of these accounts are inconsistent with the evidence that Esmerelda had bruises along the side of her abdomen that showed signs of healing. Finally, after describing all of the injuries Esmerelda suffered, including the numerous bruises and the rib fractures, Dr. Greenbaum opined that the child's injuries were caused by physical abuse.

Although the evidence on this count is thinner — which may explain why the jury convicted Gomez of the lesser included offense of second degree child cruelty and acquitted Huitron — the sum of the evidence, when properly

17

viewed in the light most favorable to the verdict, was legally sufficient. See

Jackson, 443 U. S. at 319. See also Hendrick v. State, 257 Ga. 17, 17 (354 SE2d

433) (1987) (holding that evidence that the child victim's extensive injuries

occurred over time, which did not match the defendant stepmother's story that

they resulted from a fall from the bed, and her lack of concern for previous

injuries to the child was sufficient to support her conviction for malice murder);

Thompson v. State, 262 Ga. App. 17, 17-18 (585 SE2d 125) (2003) (holding

that evidence that the child victim's injuries had happened over a period of

months and the parents had not sought medical attention, were evasive when

questioned about the injuries, and could not explain how the injuries occurred

or name anyone who caused them was sufficient to convict the parents of child

cruelty).[9]

Sentencing Errors

4.    In wading through the multitude of charges brought by the State

based on what the evidence indicated was a single deadly act by Appellants, the

trial court made a few errors in entering convictions and imposing sentences.

---

[9] Finally, although not disputed by Gomez, we note that the evidence was sufficient to support her two misdemeanor convictions for contributing to the deprivation of a minor.

For the reasons discussed below, we correct those errors by vacating both Appellants' convictions and sentences for felony murder based on the deprivation of a minor (Count 4), aggravated assault with hands (Count 11), and second degree cruelty to children (Count 16).

(a) As charged in Count 4 of the indictment, Appellants were convicted of felony murder based on contributing to the deprivation of Esmerelda "by failing to provide for [her] protection . . . , which caused [her] to be deprived and resulted in her death." Contributing to the deprivation of a minor is a felony when the offense "result[s] in the serious injury or death of a child." OCGA § 16-12-1 (d.1).[10] As the State now correctly concedes based on our recent decision in Williams v. State, 299 Ga. 632 (791 SE2d 55) (2016), "the felony deprivation statute cannot be used as a predicate offense for felony murder." Id. at 634. Accordingly, we vacate Appellants' convictions for felony murder based on contributing to the deprivation of Esmerelda.[11]

---

[10] The crime is also a felony if it is the defendant's third or subsequent offense. See OCGA § 16-12-1 (d) (2). There is no evidence that Appellants had ever been convicted of this crime before. As noted in footnote 17 below, OCGA § 16-12-1 has been amended several times since 2010, but the amendments have not affected the provisions governing when the crime is a felony.

[11] We also note that under Georgia law governing homicide convictions, it was improper for the trial court to enter a conviction and sentence on both counts of felony murder for the additional reason that one of those counts must be vacated by operation of law. See Noel v. State,

19

The State argues that because this felony murder conviction must be vacated, the underlying count of contributing to the deprivation of Esmerelda resulting in her death (Count 7) should "unmerge" and a conviction and sentence should be imposed on that count. We do not agree. This Court has repeatedly held that only one conviction and sentence may be imposed for the killing of a single victim. See, e.g., Hendrix v. State, 298 Ga. 60, 66-67 (779 SE2d 322) (2015) ("[B]ecause there was but a single victim, [the defendant] cannot be convicted and sentenced on both [the malice murder and felony murder] counts[.]"); Noel v. State, 297 Ga. 698, 700 (777 SE2d 449) (2015) ("[A] defendant found guilty of the felony murder of the same victim through the commission of more than one felony may only be sentenced on one felony murder charge[.]"); Lawson v. State, 280 Ga. 881, 883 (635 SE2d 134) (2006) ("Because there is only one murder victim, 'to convict and sentence [the defendant] for both voluntary manslaughter and felony murder [based on possession of a firearm by a convicted felon] would improperly subject [him] to multiple convictions and punishments for one crime.'" (citation omitted));

_____

297 Ga. 698, 700 (777 SE2d 449) (2015). Because it is clear in this case which felony murder conviction must be vacated — the one on Count 4 — we need not remand for the trial court to make that decision. See id.

20

Diamond v. State, 267 Ga. 249, 251 (477 SE2d 562) (1996) (explaining that the vehicular homicide count was correctly treated as surplusage to the felony murder based on burglary conviction because the defendant "can be convicted only once for the death of each victim"). Because Appellants were convicted and sentenced on Count 3 for felony murder based on aggravated assault resulting in Esmerelda's death, they cannot be convicted and sentenced on the felony child deprivation count, as that crime also was predicated on Esmerelda's death.[12]

(b)     Appellants were found guilty of two counts of aggravated assault with an "object . . . which, when used offensively against a person, is likely to or actually does result in serious bodily injury." OCGA § 16-5-21 (b) (2). Count 11 charged Appellants with using hands to cause acceleration/deceleration injuries resulting in hemorrhages of Esmerelda's brain and eyes, and Count 12

---

[12] We note that in a case decided in 2015, this Court allowed sentences for malice murder and felony child deprivation based on the death of the same victim to stand. See Stewart v. State, 296 Ga. 448, 450 (769 SE2d 50) (2015). The appellant in that case raised the argument against convictions for both felony murder and felony child deprivation that we endorsed a year later in Williams, but we found that argument "inapposite" because "appellant was sentenced for malice murder, and all felony murder convictions against him were vacated as a matter of law." Stewart, 296 Ga. at 450. The appellant did not argue that he could not be convicted and sentenced for both malice murder and felony child deprivation resulting in death. To the extent that Stewart indicates that a defendant may be convicted of and sentenced for both of those offenses involving the death of the same victim, that case is disapproved.

21

charged them with using an unknown object to cause her skull fracture. The trial court properly merged Count 12 into the felony murder conviction based on that aggravated assault, but Appellants were convicted and sentenced on Count 11. This was error. Both aggravated assault counts required proof of the same elements — an assault with a deadly object. And there was no evidence of a deliberate interval between Esmerelda's eye and brain injuries and her skull injury; indeed, the evidence indicates that all of these injuries likely resulted from the same act — one or both of the Appellants hitting Esmerelda's head against a hard surface. "Because there was no evidence that the [injuries] occurred in a manner other than in a single transaction, with no 'deliberate interval,' . . . only a single verdict for aggravated assault can stand, and the remainder must be merged into that verdict." Jeffrey v. State, 296 Ga. 713, 718 (770 SE2d 585) (2015). See also Schutt v. State, 292 Ga. 625, 627 (740 SE2d 163) (2013) (requiring merger of aggravated assault into malice murder because there was no deliberate interval between the murder, which was accomplished with a knife and hammer, and the aggravated assault, which was accomplished with only a knife). Accordingly, Count 11 merges into the felony murder count based on aggravated assault, just as Count 12 did, and we therefore vacate

22

Appellants' convictions and sentences on Count 11.

(c) Appellants were convicted of second degree child cruelty for striking Esmerelda with an unknown object causing contusions to her head, torso, and extremities (Count 16), and first degree cruelty to children by causing acceleration/deceleration injuries resulting in hemorrhages of the brain (Count 17). Although there was testimony that Esmerelda had some bruises that had begun to heal on her torso and extremities, Count 16 does not allege that Appellants caused those past injuries; it alleges only that Appellants caused contusions on the day of Esmerelda's death, meaning that the charged injuries occurred on the same day as the injuries in Count 17. As with the two aggravated assault charges, there was no evidence that these injuries resulted from acts of cruelty separated by a deliberate interval. And again the elements required to prove the two charges overlap; Count 16 and Count 17 both required proof that Appellants "cause[d] a child under the age of 18 cruel or excessive physical or mental pain." OCGA § 16-5-70 (b), (c). The only difference between the crimes is that because the conviction on Count 16 was for *second* degree child cruelty, it required proof of criminal negligence, which is a less culpable mental state than the malice required to prove *first* degree child cruelty

23

as charged in Count 17. See id.; OCGA § 16-1-6 (1) (explaining that one crime is included in another when "[i]t is established by proof of . . . a less culpable mental state"). Accordingly, Count 16 should have been merged into Count 17, and we therefore vacate each Appellants' conviction on Count 16.[13]

### Contentions Raised by Both Appellants

5.     At trial, Appellants were represented by separate counsel. Neither defense attorney presented any experts to rebut the State's four medical experts, whose testimony is discussed in Division 1 above. Appellants contend that this omission constituted ineffective assistance of counsel. To prevail on this claim, they must prove both that their lawyer's performance was professionally deficient and that they were prejudiced as a result. See Lupoe v. State, 300 Ga. 233, 239 (794 SE2d 67) (2016). To prove deficient performance, an appellant "must show that the lawyer performed his duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms." Id. at 239-240 (citation and punctuation

---

[13] We note that for the same reasons, Count 15 (second degree child cruelty by causing acceleration/deceleration injuries resulting in hemorrhages of the eyes), which the trial court merged into Count 11, should properly have been merged into Count 17 (first degree child cruelty by causing acceleration/deceleration injuries resulting in hemorrhages of the brain), but this mistake did not result in an error in Appellants' ultimate sentences.

omitted). And to prove prejudice, an appellant "must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 240 (citations and punctuation omitted). "This burden, although not impossible to carry, is a heavy one. Moreover, in examining an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 240 (citation and quotation marks omitted).

At the motion for new trial hearing, both trial counsel testified that after conducting limited investigations, they concluded that they would not be able to find an expert who would strongly support their clients' story that Esmerelda injured herself by accident. The fact that each Appellant, when represented by new post-trial counsel, found a medical expert to testify on their behalf at the motion for new trial hearing undermines to some extent the reasonableness of the pre-trial investigations. But we need not decide if the failure of trial counsel to find these post-trial experts amounted to deficient performance, because Appellants have failed to demonstrate a reasonable probability that the outcome of the trial would have been different if the testimony given by those experts at the motion for new trial hearing, which is summarized in Division 2 above, had

25

been offered at trial. See Palmer v. State, 274 Ga. 796, 797 (560 SE2d 11) (2002).

Although both of the post-trial defense experts testified that they disagreed with some of the testimony given by the State's experts, challenging in particular Dr. Darrisaw's testimony that Esmerelda's injuries appeared to have happened on the apartment's patio, the defense experts' ultimate conclusions on the cause of the injuries were equivocal; both doctors said only that Esmerelda's injuries could have been caused accidentally, including by falling off the bed, *or* intentionally. We see no reasonable probability that the jury would have found the equivocal testimony of these experts more persuasive than the trial testimony given by the experts offered by the State; the trial court, which watched the new experts testify, gave no indication that it found them credible.

All four of the State's experts had treated Esmerelda at some point or directly examined the injuries that led to her death, and Dr. Greenbaum and Dr. Darrisaw had visited Appellants' apartment and seen the bedroom where Appellants claimed the fall occurred; they were able to examine the furniture in the room and listen to Appellants' accounts as they supposedly re-enacted how they found Esmerelda. By contrast, Appellants' paid experts had never

26

examined Esmerelda or the apartment. Moreover, among the State's experts were doctors qualified as experts in pediatric emergency medicine (Dr. Shroff), forensic pathology and child abuse medicine (Dr. Greenbaum), and forensic pathology and pediatric forensic pathology (Dr. Darrisaw). The expert Huitron found after trial (Dr. Frist) was not qualified or board-certified in forensic pathology, and Gomez's expert (Dr. Shaker) admitted on cross-examination that his conclusion in a similar case that a child's head injuries were not the result of wrongdoing but rather of disease had been undermined by both his former supervisor and an expert on that disease. Accordingly, Appellants' claim of ineffective assistance on this ground is not sustainable.

6. Appellants raise two more claims of ineffective assistance related to the expert testimony. These claims also lack merit.

(a) The State's last witness, Dr. Darrisaw, testified that the concrete patio was the only surface in Appellants' apartment that seemed consistent with Esmerelda's injuries. That testimony at trial was the first Appellants knew of this impression, because it was not included in the report by Dr. Darrisaw that the State had provided to Appellants before trial. Appellants contend that their trial attorneys should have objected to this unexpected testimony and sought a

continuance or mistrial, and assert that the failure to do so constituted ineffective assistance. However, even assuming that the State knew about Dr. Darrisaw's impression before trial and should have disclosed it to Appellants, they have failed to show that their attorneys' decisions to forgo objecting was deficient. See OCGA § 17-16-4 (a) (4) (requiring pre-trial discovery of expert opinions); Murphy v. State, 299 Ga. 238, 243 (787 SE2d 721) (2016) (holding that the State was required to disclose the expert's opinion that the prosecutor admitted she learned of before trial, but concluding that the trial court ultimately did not abuse its discretion in allowing this opinion into evidence).

"Trial tactics and strategy . . . are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them." McNair v. State, 296 Ga. 181, 184 (766 SE2d 45) (2014). Here, both trial attorneys testified at the motion for new trial hearing about their decisions not to object. Gomez's counsel explained that he believed Dr. Darrisaw's testimony was "something [he] could even try to turn to [Gomez's] advantage" by pointing out that the State presented, with its last witness, "a brand new theory of how [the injuries] happened." Huitron's counsel explained that he "didn't think that testimony, as surprising as it was,

28

was fatal to [his] client's position." Counsel believed that, rather than objecting, it was "easier to explain to a jury that . . . it didn't happen to this girl this way." Both attorneys said that they wanted to focus on the fact that the physical evidence, including that blood spots were found only in the house and that the hair found outside was never determined to belong to Esmerelda, contradicted Dr. Darrisaw's new trial theory. This strategic decision was not patently unreasonable. See id.

(b)     Esmerelda's pediatrician, Dr. Iyer, testified that the child's head injuries looked like they resulted from abuse rather than a fall from a bed based on an autopsy photograph that the doctor saw a year before trial. Appellants argue that their trial counsel should have objected to this testimony, but they have not offered a legitimate basis for this objection. Although the autopsy photograph was not admitted into evidence, Appellants have not shown that the doctor's testimony was improper. See Naji v. State, 300 Ga. 659, 663 (797 SE2d 916) (2017) (explaining that under Georgia's old Evidence Code, "an expert may give an opinion based upon facts personally observed by the expert and upon data collected by another and personally observed or reviewed by the expert"). Because Appellants have not demonstrated that an objection to Dr.

29

Iyer's testimony would have been successful, this ineffective assistance claim fails. See Burrell v. State, 301 Ga. 21 (799 SE2d 181) (2017).

Contentions Raised Only by Gomez

7. Gomez alone raises three more ineffective assistance of counsel claims, which also lack merit.

(a) First, Gomez disputes her trial counsel's decision not to object to a snippet of hearsay testimony. Specifically, Officer Henry, who responded to Appellants' apartment on the day of Esmerelda's injuries, testified that when she arrived on the scene, another officer told her that her specialty in child abuse might be helpful in the case because a month earlier, someone had called the Division of Family and Children Services and asked it to do a wellness check. At the motion for new trial hearing, Gomez did not question her trial counsel about his decision not to raise this objection. His decision "'is therefore presumed to be a strategic one,'" Lupoe v. State, 284 Ga. 576, 578 (669 SE2d 133) (2008) (citation omitted), and the "decision not to draw attention to this [passing] remark by making an objection" is not so obviously unreasonable as to constitute deficient performance, Babbage v. State, 296 Ga. 364, 370 (768 SE2d 461) (2015).

(b)     Next, Gomez contends that her trial counsel was ineffective in failing to object to testimony describing the hair found near the patio as human hair when no testing was ever done to determine if it actually was human hair. Gomez also argues that her counsel should have asked Dr. Darrisaw to compare the length of the hair found near the patio with Esmerelda's hair to show that the patio hair was too long to be Esmerelda's. However, Gomez did not raise this ineffective assistance claim when she was represented by new counsel in her motion for new trial and the trial court did not rule on it, so the claim was not preserved for review on appeal. See Stewart v. State, 299 Ga. 622, 628 (791 SE2d 61) (2016) (explaining that a claim of ineffective assistance must be raised at the "earliest practicable moment").

(c)     Finally, Gomez contends that her trial counsel was ineffective in failing to object to the trial court's instruction to the jury on aggravated assault. As discussed in Division 4 (b) above, Gomez was charged with one count of aggravated assault against Esmerelda using hands and one count of aggravated assault against Esmerelda using an unknown object. The trial court instructed the jury on each of these counts, and as part of that charge said: "Hands, if and when used in making an assault upon another person, is [sic] not a deadly

31

weapon per se, but may or may not be a deadly weapon depending upon the manner in which they are used in the circumstances of the case." Gomez asserts that this charge was confusing because it implied that to constitute the crime of aggravated assault, hands must always be used, which conflicts with the charge of aggravated assault with an unknown object. This claim of ineffective assistance also was not preserved for appellate review because Gomez did not raise it in her motion for new trial. See Stewart, 299 Ga. at 628.

Because Gomez also seeks review of this alleged instructional defect for plain error under OCGA § 17-8-58 (b), we note that the jury instruction was appropriate and not misleading, so an objection to it would have been properly denied. Thus, it was not plain error. See Woodard v. State, 296 Ga. 803, 807 (771 SE2d 362) (2015).

8. Gomez contends that the jury's guilty verdicts on the aggravated assault and related felony murder counts were inconsistent with her acquittal on the aggravated battery and related felony murder counts. This contention fails because,

> [a]s a general rule, a guilty verdict cannot be challenged on the ground that the jury's verdict of guilt on one count of an indictment is inconsistent with an acquittal on another count. Such verdicts are

32

deemed constitutionally tolerable because they may reflect an exercise of lenity by the jury that is not necessarily grounded in its view of the evidence.

State v. Springer, 297 Ga. 376, 377 (774 SE2d 106) (2015) (citations omitted).

9. At trial, the jury voir dire, opening statements, and closing arguments were not transcribed. Gomez claims that the trial court erred in not ensuring transcription of these portions of the trial, but she has not shown that this was error or how she was harmed by the absence of a transcript. Thus, her claim fails. See Norton v. State, 293 Ga. 332, 339 (745 SE2d 630) (2013).

10. Finally, Gomez alleges that an evidentiary error occurred during the motion for new trial hearing. On direct examination, Gomez's medical expert, Dr. Shaker, testified that Esmerelda was 36 inches tall and the bed Appellants claimed she was jumping on when she fell was 25 inches high. Gomez then asked: "Now, what's the most you think, with the help of a spring bed, do you think the child would be able to jump?" The State objected, arguing that the question called for speculation; the trial court sustained the objection. A little while later, Gomez asked Dr. Shaker: "Would you know what a child — from your training and education know what a child of, let's say, two years of age would be expected to be able to jump?" The court told Gomez to move on, as

it had already sustained the objection. Gomez then asked: "Now, Doctor, would you agree that if a child was jumping on a bed they might gain some height in the air over what they will be just standing?" The State again objected, but the court overruled the objection, and Dr. Shaker answered, "Yes."

Gomez asserts that the trial court erred in sustaining the State's initial objection. But that ruling was not an abuse of discretion, because Gomez had not established that Dr. Shaker, who was qualified as an expert in anatomic, clinical, and forensic pathology, had any expertise or personal knowledge about how high Esmerelda or an average two-year-old (Esmerelda was actually three) could jump on a "spring bed." Moreover, Gomez has failed to show harm from the court's ruling. Dr. Shaker was allowed to testify that a child jumping on a bed would fall from a greater height than her standing height, and Gomez did not proffer Dr. Shaker's answer to the objected-to question, so she has not shown that it would have been more beneficial to her than the testimony the doctor gave. See Lyons v. State, 271 Ga. 639, 643 (522 SE2d 225) (1999) (explaining, in a case decided under the old Evidence Code, that to assert "an error regarding testimony sought to be introduced on direct examination," the complaining party must show what the testimony would have been "and that

such testimony was material and would have benefited the complaining party").[14]

Contentions Raised Only by Huitron

11. Neither Gomez nor Huitron, who are native Spanish speakers, was able to communicate effectively in English at the time of the trial, so interpreters were used. Huitron raises two claims dealing with the interpreters; neither warrants a new trial.

(a) On the first day of trial, the court provided each Appellant with an interpreter. The next day, however, Huitron's interpreter did not come to court, so that day and for the rest of the trial, Appellants shared the interpreter originally designated for Gomez. (The court also had a third interpreter to translate witness testimony given in Spanish into English for the court, jury, and others in the courtroom.) Huitron contends that he is entitled to a new trial based on this interpreter sharing, raising the claim as both trial court error and ineffective assistance of counsel.

Interpreters are required to ensure meaningful access to our legal system

---

[14] In the new Evidence Code, this issue is governed by OCGA § 24-1-103 (a) (2).

by non-English speakers. We have explained that "one who cannot communicate effectively in English may be effectively incompetent to proceed in a criminal matter and rendered effectively absent at trial if no interpreter is provided." Ling v. State, 288 Ga. 299, 299 (702 SE2d 881) (2010). See also Georgia Supreme Court Rules for the Use of Interpreters for Non-English Speaking and Hearing Impaired Persons (hereafter, "Interpreter Rules"), Rule II (A), Rules for Foreign Language Interpreters (explaining that the judge must provide an interpreter for a non-English speaker who "cannot understand and speak English well enough to participate fully in the proceedings and to assist counsel"); Interpreter Rules, Rule III (A), Criminal Cases: Foreign language interpreters ("Each non-English speaking party will be provided with an interpreter at each critical stage of the proceedings at no cost."). Huitron cannot contend that he was "rendered effectively absent" from his trial, because he was provided with an interpreter and thus was able to understand all of the proceedings. He argues, however, that because this interpreter was also assigned to Gomez, he was not able to use the interpreter to communicate confidentially with his counsel. See Ling, 288 Ga. at 301 ("'[E]very criminal defendant . . . must possess sufficient present ability to consult with his lawyer

36

with a reasonable degree of rational understanding.'" (citation and punctuation omitted)). See also Interpreter Rules, Introduction § VI (G) ("The presence of an interpreter shall not affect the privileged nature of any discussion.").

It is undoubtedly the better practice for each defendant in a criminal case to have his or her own interpreter to ensure that confidential attorney-client communications are not hindered; when an interpreter must be shared, the court should take measures to ensure that each defendant has adequate opportunities throughout the proceedings to confer confidentially with his or her counsel via the interpreter. Neither Huitron nor his trial counsel, however, ever complained at trial that they were prevented from conferring, confidentially or otherwise. And even on appeal, where Huitron has not suggested that he has any barrier to communication with his counsel, he has not identified anything specific that he was prevented from communicating to trial counsel at any point. In fact, trial counsel testified at the motion for new trial hearing that Huitron could have asked for another interpreter, but when counsel told Huitron that his original interpreter could not be there, Huitron "wasn't concerned about it." Counsel also testified that although sharing was not as convenient and may have "limited" his ability to communicate with Huitron, he did not think Huitron was

37

harmed and there was nothing that he needed to, but was unable to, communicate with Huitron.

Because Huitron has not shown that he was actually harmed by sharing an interpreter, he has failed to demonstrate either that the trial court committed reversible error or that his trial counsel was ineffective in failing to secure a second interpreter. See Hung v. State, 284 Ga. 796, 798 (671 SE2d 811) (2009) (rejecting a similar claim of ineffective assistance when "nothing in the record demonstrates that defendant's rights were impinged by the use of a single interpreter"); Fowler v. Grimes, 198 Ga. 84, 88 (31 SE2d 174) (1944) ("Under the evidence, the judge was authorized to find that no request was made of the trial judge either by the accused or his counsel for an opportunity to confer privately and without the presence of the deputy marshal; and this being true, it does not appear that any right of the applicant was violated."). See also People v. Rodriguez, 728 P2d 202, 207-208 (Cal. 1986) (rejecting a claim by co-defendants that having to share an interpreter violated their constitutional rights, because "nothing in the record shows that at any point while this situation existed, either defendant's ability to communicate or comprehend was impeded" and they failed "to point to any potential or actual conflict" arising from the

shared interpreter); State v. Nguyen, 185 P3d 368, 372 (N.M. Ct. App. 2008) (collecting similar cases).

(b)     Huitron also argues that the trial court should have given a jury instruction about interpreters and that his trial counsel was ineffective in not asking for such an instruction. Huitron relies on Diaz v. State, 743 A2d 1166 (Del. 1999), in which the Delaware Supreme Court held that "[a]ppropriate explanations of the role of an interpreter should be provided to the jury in trials involving juries." Id. at 1173. Huitron asserts that such a jury instruction was necessary to combat the potential negative effects of using an interpreter, such as making the trial longer and drawing attention to his status as an immigrant. He says an instruction should also advise the jury to take as evidence only the English interpretation given by the court's interpreter, to make no inferences as to any differences in the length of a question or answer between the two languages, to rely exclusively on the interpretation, and to draw no inferences as to the witness's or the defendant's need for an interpreter. See Diaz, 743 A2d at 1175 ("In trials involving foreign language testimony and English translation when one or more jurors are bilingual, federal judges endeavor to maintain a completely impartial jury by giving special instructions to the entire jury panel

prior to opening arguments and at the end of the case[.]").

Because Huitron did not request a jury instruction on interpreters at trial, we review the trial court's failure to give such a charge only for plain error. See OCGA § 17-8-58 (b); State v. Kelly, 290 Ga. 29, 33 (718 SE2d 232) (2011). Huitron acknowledges that there is no Georgia law indicating that such an instruction should be given. There also was no evidence at his trial that any of the jurors were bilingual, which might lead them not to rely on the court interpreter's translation, or that they harbored any bias against Huitron based on his immigration status. He therefore has failed to show that it was error, let alone plain error, for the trial court not to give an instruction on the use of interpreters. See Woodard, 296 Ga. at 807. Likewise, Huitron has failed to prove that his trial counsel was deficient in failing to request such a novel jury instruction. See Propst v. State, 299 Ga. 557, 565-566 (788 SE2d 484) (2016).[15]

12.   Huitron raises several more meritless claims of ineffective assistance of counsel.

(a)   At trial, Ana Maldonado testified that it was her understanding that

---

[15] Our holding on this issue should be understood as limited to the context of plain error and ineffective assistance.

40

Huitron did not want Gomez's son, Joseph, in his home. Huitron argues that his trial counsel should have objected to this testimony as irrelevant because Huitron was not charged with any crime related to Joseph and the testimony's prejudicial effect outweighed its probative value. However, the evidence was clearly relevant and probative to the trial because it provided a motive for Gomez's abandonment of Joseph, a crime with which she was charged. It also was relevant in showing Huitron's views of Gomez's children. To the extent that Huitron is arguing that the prejudicial impact of this testimony outweighed any probative value as to his charges and that his counsel therefore should have sought some sort of limiting instruction regarding the jury's consideration of this testimony's pertinence as to his case, even if we assume that such an instruction would have been granted, it was reasonable strategy for Huitron's counsel to choose not to draw attention to this comment's relevance to the charges against Huitron, rather than only the charges against Gomez, by objecting. See Ford v. State, 290 Ga. 45, 49 (717 SE2d 464) (2011) ("An attorney's decision not to seek a limiting instruction to avoid drawing attention to the subject of the instruction is a matter of trial strategy that falls within the range of reasonable professional conduct when, as here, it is a reasonable

41

decision.").

(b)    Huitron argues that his trial counsel should have sought to sever his trial from Gomez's.

> The trial court has broad discretion to grant or deny a motion for severance in a murder case where the death penalty is not sought, and in the exercise of that discretion, the trial court is to consider if the number of defendants would create confusion as to the law and evidence applicable to each, if there is the danger that evidence admissible against one defendant will be considered against the other despite the court's instructions, and if the defenses of the defendants are antagonistic to each other or to each other's rights. [Huitron] cannot establish prejudice in the failure to request severance, because [he] has not shown either that a motion should or would have been granted.

Dulcio v. State, 292 Ga. 645, 654 (740 SE2d 574) (2013).  Even assuming that the snippet of testimony just discussed about Huitron not wanting Joseph at the apartment was evidence that might have been excluded if Huitron had been tried separately, the trial court would have been well within its discretion to deny a motion to sever.  Thus, Huitron has not shown that such a "motion to sever would have been successful, and therefore, cannot establish a deficiency of counsel for not making the motion."  Id. at 654.

Moreover, at the motion for new trial hearing, trial counsel explained that he did not seek to sever Huitron's trial because he believed that "the more bad

42

things that came out about [Gomez], regardless of the source[,] were good for [Huitron]." This was not a patently unreasonable trial strategy. See <u>Powell v. State</u>, 297 Ga. 352, 356 (773 SE2d 762) (2015).[16]

(c)    At trial, Huitron's counsel requested the pattern charge on involuntary manslaughter. He did not specify what the evidentiary basis for such a charge was, and he withdrew it at the charge conference. Huitron contends that this withdrawal was deficient performance because involuntary manslaughter was a lesser included offense of the charge of felony murder based on contributing to the deprivation of a minor.

The deprivation count underlying that felony murder charge alleged that Huitron caused Esmerelda to be deprived by "willfully fail[ing] to provide for [her] protection . . . pursuant to OCGA § 19-7-2 " and that such act caused her to be "without proper parental care . . . and said failure resulted in [her] death."[17]

---

[16] Huitron also raises this claim and the claim discussed in the previous subdivision as trial court error, but "he has waived his claim of error to the extent that he did not timely object at trial." <u>Thomas v. State</u>, 293 Ga. 829, 832 (750 SE2d 297) (2013); <u>Thorpe v. State</u>, 285 Ga. 604, 609 (678 SE2d 913) (2009).

[17] As relevant to this case, OCGA § 16-12-1 (b) (3) said in May 2010 that a person commits the offense of contributing to the deprivation of a minor when such person "[w]illfully commits an act or acts or willfully fails to act when such act or omission would cause a minor to be found to be a deprived child as such is defined in Code Section 15-11-2." One definition of "deprived child" in the May 2010 version of OCGA § 15-11-2 was a child who "is without proper parental care or

The Court of Appeals has held that "the death of a child resulting from a negligent omission to comply with th[e] duty [imposed by OCGA § 19-7-2] 'would amount to involuntary manslaughter by the commission of an unlawful act.'" Lewis v. State, 180 Ga. App. 369, 371-372 (349 SE2d 257) (1986) (citation omitted). But whether or not Lewis was correctly decided or would be applicable to the facts of this case, we are vacating Huitron's conviction and sentence for felony murder based on child deprivation; in addition, Huitron properly was not convicted or sentenced on the underlying felony deprivation count. See Division 4 (a) above. Thus, he cannot show that his counsel's withdrawal of the requested instruction prejudiced him. See Richardson v. State, 276 Ga. 548, 551 (580 SE2d 224) (2003) (explaining that an issue concerning a count on which the appellant was not convicted or sentenced was

control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." These statutes have since been amended several times, largely to change the terminology.

OCGA § 19-7-2 says:

It is the joint and several duty of each parent to provide for the maintenance, protection, and education of his or her child until the child reaches the age of majority, dies, marries, or becomes emancipated, whichever first occurs, except as otherwise authorized and ordered pursuant to subsection (e) of Code Section 19-6-15 and except to the extent that the duty of the parents is otherwise or further defined by court order.

moot).[18]

(d)    Finally, Huitron lists three aspects of the testimony by the State's experts that he argues were objectionable: Dr. Iyer's testimony that Esmerelda's injuries were "severe," testimony that her injuries were the kind one would see after a car collision, and testimony that her injuries came from physical abuse. This testimony, however, was admissible to describe Esmerelda's injuries and the experts' opinions as to their cause, and Huitron has not offered a basis for the proposed objections other than vaguely asserting that the testimony was "bolstering." Because he has not shown that objections to this testimony would have been successful, Huitron has failed to show that his trial counsel performed deficiently by not objecting. See Burrell, 301 Ga. at 25 (2) (d).

13.    Huitron was found guilty of aggravated assault and first degree and second degree cruelty to children. These counts required a finding that Huitron was an active perpetrator of the harm against Esmerelda, either as a principal or

---

[18]    Huitron was convicted of felony murder based on aggravated assault by causing Esmerelda's head to impact an unknown object. He correctly does not argue that negligently failing to fulfill the parental duty is a lesser included offense of aggravated assault, and he offers no other lesser included misdemeanor of aggravated assault that under the circumstances of this case would have justified an involuntary manslaughter instruction as to that felony murder count.

45

as a party to the crime. See OCGA § 16-2-20 (b).[19] Huitron also was found guilty of contributing to the deprivation of Esmerelda by willfully failing to provide for his child's protection, causing her to be left without proper parental care. See former OCGA § 16-12-1 (b) (3) (2010); Division 12 (c) above. Huitron claims that these guilty verdicts are mutually exclusive because he could not be both the perpetrator of the harm against the child and the person failing to protect the child from the perpetrator.[20]

"[V]erdicts are mutually exclusive where it is legally and logically impossible to convict the accused of both counts." Springer, 297 Ga. at 378. Huitron's claim is similar to the mutually exclusive verdicts claim that we

---

[19] OCGA § 16-2-20 (b) says:
(b) A person is concerned in the commission of a crime only if he:
    (1) Directly commits the crime;
    (2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity;
    (3) Intentionally aids or abets in the commission of the crime; or
    (4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime.

[20] If these verdicts actually were mutually exclusive, all of the affected counts would have to be vacated. See Springer, 297 Ga. at 378. Because that would result in the vacating of Huitron's convictions for felony murder based on aggravated assault and first degree child cruelty and a possible retrial, we will decide this enumeration of error, even though Huitron properly was not convicted of the child deprivation count and his conviction for aggravated assault is being vacated. See Division 4 (a) and (b) above.

46

rejected in <u>Springer</u>, in that willfully failing to protect and actively harming one's child under the circumstances of this case could be accomplished by the same conduct, with the two crimes reflecting mens rea of varying levels. See id. at 377 (overruling <u>Jackson v. State</u>, 276 Ga. 408 (577 SE2d 570) (2003), and its progeny and holding "that multiple guilty verdicts for the same conduct that are based on varying levels of mens rea are not mutually exclusive"). Whether Huitron alone slammed Esmerelda's head on a hard object, or helped Gomez slam her down, or aided and abetted Gomez without physically assisting in the assault, Huitron failed to provide parental protection for Esmerelda — even if in the first scenario, he failed to protect her only from himself. And in all of these scenarios, Huitron also committed the crimes of aggravated assault and child cruelty against Esmerelda. Thus, the jury's verdicts finding him guilty of both actively harming and failing to protect Esmerelda were not mutually exclusive.[21]

---

[21] We also note that these crimes do not merge, as they each have at least one distinct element. See <u>Jeffrey</u>, 296 Ga. at 717. The charge of contributing to the deprivation of Esmerelda required proof that Huitron caused a child to be deprived of parental care. See former OCGA § 16-12-1 (b) (3). Child cruelty required proof that Huitron caused a child cruel or excessive physical or mental pain. See OCGA § 16-5-70 (b). And aggravated assault required proof that Huitron assaulted Esmerelda with a deadly weapon or other object used as one. See OCGA § 16-5-21 (b) (2).

47

14. Finally, Huitron argues that he is entitled to a new trial based on newly discovered evidence. The "evidence" he offers is this unsworn statement given by Gomez at the sentencing hearing: "Alejandro, he's a good father. He was almost not at the house. So he didn't see . . . I did not see what happened. They don't have proof, they don't have any witness that saw what happened." This is not newly discovered evidence, nor does it exonerate Huitron. See Huff v. State, 300 Ga. 807, 812 (796 SE2d 688) (2017).

Judgments affirmed in part and vacated in part. All the Justices concur.

Decided June 19, 2017.

Murder. Clayton Superior Court. Before Judge Collier.

James E. Bischoff, for appellant (case no. S17A0265).

John W. Kraus, for appellant (case no. S17A0266).

Tracy Graham Lawson, District Attorney, Elizabeth A. Baker, Erman J. Tanjuatco, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, for appellee.

48