**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: February 3, 2026

S25A0124.  HUITRON v. TOBY, WARDEN.

MCMILLIAN, Justice.

Alexandro Huitron appeals the denial of his habeas petition stemming from his convictions for felony murder and other crimes arising from the death of his three-year-old daughter, Esmerelda Gomez.[1] Huitron argues that his appellate counsel suffered from an

---

[1] The crimes were committed on May 31, 2010. In June 2011, a Clayton County grand jury jointly indicted Huitron and his wife, Margarita Gomez, for malice murder (Count 1), three counts of felony murder (Counts 2-4), four counts of aggravated battery (Counts 5, 8-10), two counts of aggravated assault (Counts 6, 11), contributing to the deprivation of a minor (Count 7), and six counts of cruelty to children (Count 12-17). Gomez was separately indicted for two additional counts of contributing to the deprivation of a minor.  At a joint jury trial in October and November 2012, Huitron was found guilty on Counts 3, 4, 6, 7, 11, 12, and 15-17. Counts 10 and 14 were nolle prossed during trial; Huitron was acquitted on the remaining counts. On November 2, 2012, the trial court sentenced Huitron to serve life in prison without the possibility of parole for felony murder predicated on aggravated assault (Count 3), a concurrent term of life in prison without the possibility of parole for felony murder predicated on contributing to the deprivation of a minor (Count 4), a consecutive term of 20 years in prison for aggravated assault (Count 11), a consecutive term of 10 years in prison for cruelty to children (Count 16), and a

actual conflict of interest, and therefore he is entitled to a new direct appeal with conflict-free counsel. We affirm because the evidence presented at the habeas hearing supports the habeas court's finding that, even if a conflict was present, it did not significantly or adversely affect Huitron's appellate counsel's performance.

1. Huitron and his wife Margarita Gomez were charged and convicted for Esmerelda's death. In our 2017 decision affirming their convictions, we recounted the evidence from the joint trial as follows:

> On May 31, 2010, Gomez and Huitron spent the day at their apartment in Forest Park with their two daughters, Esmerelda and two-year-old Perla. Joseph, Gomez's younger son by another man, did not live with them. Around 8:00 p.m., Esmerelda suffered a severe head injury, resulting in a skull fracture and brain and retinal hemorrhaging. After Appellants called 911, Esmerelda was taken to Hughes Spalding Children's

---

consecutive term of twenty years in prison for cruelty to children (Count 17). The other convictions were merged for sentencing purposes. Huitron timely filed a motion for new trial, which was amended through new counsel on September 4, 2013. Following a hearing, the trial court denied the motion for new trial, as amended, on December 11, 2015. On appeal, this Court vacated Huitron's convictions on Counts 4, 11, and 16 to correct sentencing errors, but affirmed the remaining convictions. *Gomez v. State*, 301 Ga. 445 (2017). Huitron timely filed a petition for habeas relief on June 7, 2021. The habeas court entered an order denying the habeas petition on August 9, 2024. On September 10, 2024, Huitron filed an application for a certificate of probable cause to appeal to this Court, which was granted, and his case was docketed to this Court's August 2025 term and submitted for a decision on the briefs.

Hospital and later flown to Egleston Hospital, where she died on June 3.

Gomez and Huitron were interviewed separately several times by officers from the Forest Park Police Department, first on the night of Esmerelda's injuries, again a few days later, and finally on June 10, when they each participated in a re-enactment of how they supposedly found Esmerelda. Each time, a Spanish-speaking police officer or interpreter was used. Initially, Gomez and Huitron both said that when Esmerelda was injured, they were washing dishes or about to start washing dishes together in their kitchen while the two girls were playing in the back bedroom. They heard a scream from one of the girls and ran to the bedroom. In another version given later by Gomez, Huitron was on the back patio grilling and she was in the kitchen when they heard the scream.

Both parents claimed that they found Esmerelda lying on her back on the floor between a small child's table and one of the two beds in the room. According to Gomez, Esmerelda looked as if she was struggling to speak or get up, but then she fainted. According to Huitron, Esmerelda was unconscious and having trouble breathing, with a small amount of blood on her face. They moved Esmerelda into the living room, and one or both of the parents performed CPR while an ambulance was called. Gomez then carried Esmerelda out to wait for the ambulance. Both parents claimed that they did not see what caused Esmerelda's injuries but hypothesized that she had fallen while jumping on the bed, because she liked to play on the bed. Dr. Jordan Greenbaum, who was the medical director of the Center for Safe and Healthy Children at Children's Healthcare of Atlanta and had been called to

consult on Esmerelda's case at Egleston because the treating doctors suspected child abuse, called Gomez on June 2 to get a medical history for Esmerelda. The doctor asked Gomez specifically about a big bruise Esmerelda had on her abdomen, which Gomez attributed to the child hitting herself on furniture. Dr. Greenbaum, who noticed numerous bruises on Esmerelda's belly, also asked Gomez if she could think of any injuries she had seen on Esmerelda's skin and Gomez said she could recall only one bruise; she had not noticed any other bruising.

The next day, Officer Karen Henry, who was assigned to investigate in Esmerelda's case because she specialized in child abuse cases, interviewed Gomez. Gomez said that she never saw any bruises or marks on Esmerelda, that the only other injury Esmerelda had suffered was eight days earlier when she fell in the bathtub, and that Esmerelda had fallen out of bed while sleeping but had not injured herself. Officer Henry testified, however, that the pictures she saw of Esmerelda showed bruises on the side of her abdomen, from her armpit to her diaper area, that had begun to heal.

When examining Appellants' apartment about three hours after the 911 call, investigators found clumps of dark hair in the bathroom and outside, one to two feet from the concrete patio. They also found spots of dry blood on the floor in the front bedroom, in the hallway between the bathroom and bedrooms, and on the floor in the back bedroom. The swabbings taken from these spots matched Esmerelda's DNA. Several officers testified that the apartment was very neat, including the kitchen and back bedroom, and the beds looked like they had recently been made; although the comforter on one of the beds looked a little disheveled, that was not the bed next to which the

4

parents said they found Esmerelda.

At trial, four medical experts testified for the State. Dr. Amita Shroff, who treated Esmerelda at Hughes Spalding and was qualified as an expert in pediatric emergency medicine, testified that Esmerelda had a "Battle's sign" — bruising on the side of her face, behind her ear, and tracking down her neck — which indicates a skull fracture, and fixed and dilated pupils, which indicate brain damage. She also had blood in her ear and on her nose, as well as bruises on her nose, chin, back, and abdomen. The child's abdomen was distended and she had an abrasion on her left flank. The doctor testified that there was no way a fall from a bed could have caused these injuries; they could be caused only by something traumatic like a car accident, falling off a 15- to -20 story building, or having her head slammed onto a hard object like concrete or a bathtub.

Dr. Rajamani Iyer testified that she was Esmerelda's pediatrician, and at all her visits, including the last visit four weeks before the incident, Esmerelda seemed normal. A year before trial, the prosecutor had shown Dr. Iyer an autopsy photograph of Esmerelda's head, and Dr. Iyer, who was qualified as an expert in pediatric medicine, testified based on that photograph that Esmerelda's injuries were not consistent with a fall from the bed and looked like child abuse. Dr. Iyer also testified that the injuries could have been caused by a chair, concrete, or other hard object.

Dr. Greenbaum, who was qualified as an expert in forensic pathology and child abuse medicine, also was present at the re-enactment. Dr. Greenbaum testified that Esmerelda had a complex Y-shaped skull fracture

5

and subdural and sub-retinal hemorrhages. She explained that the sub-retinal hemorrhaging was so severe that it could only be caused by a few things, including major head trauma and leukemia (and there was no evidence that Esmerelda had leukemia). Dr. Greenbaum further explained that Esmerelda's injuries involved high acceleration and deceleration forces of the sort seen in a high-speed car accident, a fall from three or more stories, or by a person much bigger than Esmerelda slamming her head on the floor. Dr. Greenbaum also testified that Esmerelda had numerous injuries to her torso and two rib fractures which had begun to heal, meaning they were at least seven to ten days old. Dr. Greenbaum concluded from all of this information that Esmerelda's injuries were caused by abuse.

The State's final witness was Dr. Lora Darrisaw, the GBI medical examiner who performed Esmerelda's autopsy and who was qualified as an expert in forensic pathology and pediatric forensic pathology. Dr. Darrisaw testified about scattered bruises on the child's body, including a collection on the right side of her body and one on her jaw, which would normally be seen after forceful grabbing of the head; although it was possible, but not likely, that the bruise on Esmerelda's chin was caused by medical intervention, none of the other bruises could have been. She added that Esmerelda's neck had been "impacted," meaning it had been hyperextended over a curved surface or the corner of a hard object. Dr. Darrisaw, who was also present at the re-enactment by Appellants, examined the chairs in the bedroom and concluded that even though they were metal, they were small, fold-up chairs that could not have caused the injuries. The doctor testified that Esmerelda's injuries could have been caused only by "[h]er head hit[ting]

6

something very, very hard that doesn't move," so the doctor could not see how Esmerelda could have sustained her injuries by falling on anything in the bedroom; the only surface that seemed consistent with the injuries was the concrete patio outside the apartment. Dr. Darrisaw explained that Esmerelda's neck injuries and the bleeding in her eyes indicated that she was moving fast, which could be caused by her falling from a height greater than her own or someone picking her up and moving her body with a lot of force before she impacted a surface. Dr. Darrisaw also noted that there was a build-up of iron in Esmerelda's brain, indicating that she had suffered an earlier head injury. Dr. Darrisaw ruled the cause of death to be blunt force trauma and concluded that it was non-accidental.

Several witnesses testified about the relationship between Esmerelda and her parents. An officer who talked to Gomez at the hospital on the night Esmerelda was taken there testified that Gomez cried briefly when she was told that Esmerelda might die. Another officer, who spoke to Gomez later that night, testified that when he told her that Esmerelda might die, she said she believed that Esmerelda would be okay, but she started crying when he told her that she would not be able to take her other daughter, Perla, home.

Joanna Duarte, one of Gomez's friends, testified that Gomez had said Esmerelda was the "product of a rape" and that Gomez sent the child to Mexico when she was ten or eleven months old. Around November 2009, when Esmerelda was about three, Gomez asked Duarte to go get her and bring her back. Esmerelda had lice when she returned, and when Duarte gave Esmerelda to Gomez, she offered to get Gomez a prescription for lice shampoo.

Instead, Gomez shaved off all of Esmerelda's hair to prevent the lice from spreading to Perla. Duarte testified that Gomez always showed Perla more affection, saying that Perla was prettier because she looked like Huitron and calling Esmerelda ugly. Duarte also observed that Esmerelda did not seem very attached to her mother and whenever Esmerelda saw Duarte, she would say she wanted to go with Duarte. Ana Maldonado, who sometimes cared for the children, testified to the child having a similarly strained relationship with Huitron, who worked in Columbus, Georgia during the week. On one occasion, Maldonado dropped Esmerelda off with him, and when he grabbed her, Esmerelda reacted in a way that indicated she did not want to be left with him.

A caseworker with the Babies Can't Wait program of the Georgia Department of Health testified that when she came to do an evaluation of Gomez's son, Joseph, in November 2009, Joseph and Esmerelda looked malnourished, and Esmerelda was dressed in torn clothes and looked small for her age and frightened. This prompted the caseworker to make a referral for Esmerelda, as well as Joseph, to receive services from Babies Can't Wait, but when the caseworker tried to follow up with Gomez, her contact numbers had been disconnected and she had moved.

The caseworker was later able to track down Joseph, discovering that he was living with Maldonado and looked healthy and happy. Testimony showed that Gomez gave Joseph, who was born around July 2009 and was not Huitron's son, to her friend Duarte's sister around October 2009. The sister cared for Joseph for about five months, during which time Gomez did not visit or provide any money for her child. The sister eventually returned

Joseph to Gomez because she had four kids of her own and was having money problems. On March 8, 2010, Gomez gave Joseph to Maldonado, and Gomez signed a notarized agreement that she would leave Joseph in Maldonado's custody permanently. Gomez told Maldonado that Joseph was sick and she could not take care of him. Maldonado also understood that Huitron did not want Joseph in his home.

Gomez and Huitron did not testify at trial or call any witnesses. The defense theory for both Appellants was that Esmerelda had been injured in an accident. The jury rejected that theory and found Appellants guilty of felony murder and other charges.

*Gomez v. State*, 301 Ga. 445, 446–50 (2017) (footnotes omitted).

After this Court affirmed his convictions,[2] Huitron timely filed

---

[2] On appeal, Huitron argued that the evidence was constitutionally insufficient, that a new trial was required because he was required to share an interpreter with Gomez, that the convictions for aggravated assault and first and second degree cruelty to children were mutually exclusive, and that he was entitled to a new trial based on a statement that Gomez made at sentencing, which Huitron claimed was "newly discovered evidence." See *Gomez*, 301 Ga. at 445. Huitron also asserted that trial counsel was ineffective for the following reasons: (1) failing to present experts to rebut the State's four medical experts, (2) failing to object to the testimony of two of the State's expert witnesses, (3) failing to ensure that Huitron had a separate interpreter; (4) failing to ask for a jury instruction about the interpreters, (5) failing to object to testimony from a witness about Huitron's relationship with Gomez's son, (6) failing to move to sever the trial, (7) withdrawing a previous request for a charge on involuntary manslaughter, and (8) failing to object to three aspects of the testimony by the State's experts about Esmerelda's injuries. See id. Gomez also asserted several different claims. See id. at 459-61. Although we corrected a sentencing error, we otherwise rejected Huitron's claims and affirmed his convictions and sentences. See id.

a petition for habeas corpus, asserting in part that John Kraus, his appellate counsel, labored under a conflict of interest because he worked for the same public defender's office that represented Huitron's co-defendant, Gomez, at trial. In Huitron's view, that meant that Kraus could not assert a claim on appeal that trial counsel was ineffective for failing to argue that Gomez was solely responsible for Esmerelda's death and could not call Gomez as a witness at the motion-for-new-trial hearing to support that claim of ineffective trial counsel.

At the habeas hearing, Kraus testified that he was a public defender with the Clayton County Public Defender's Office when he represented Huitron at his motion for new trial and on direct appeal. Kraus became concerned about a potential conflict in his representation of Huitron, since the Clayton County Public Defender's Office had represented Gomez at their joint trial. Kraus raised the conflict issue with his supervisor, who told him to remain Huitron's appellate attorney. Kraus did not mention his conflict concerns to the trial court or the prosecutors on the case.

10

When asked at the habeas hearing what his concerns were, Kraus testified that it was his understanding that any attorney who works in the same office as a trial attorney "is basically deemed, under the conflict law rules and regulations laws, to be the same as – as representing the codefendant – or as representing the defendant." Kraus also testified that he "likely … discussed the Gomez case at the time" of the trial with Gomez's trial attorney, Kevin Schumaker. Schumaker confirmed that he and Kraus "spoke daily" about the case during the trial and that Kraus later discussed the possible conflict concerns he had with him.

According to Huitron, this conflict prevented Kraus from "question[ing] Margarita Gomez about her culpability at [the motion for new] trial, or to hold a hearing where she might be questioned to determine the source of Esmerelda's injuries." In particular, Huitron points to a statement Gomez made at sentencing: "Alejandro, he's a good father. He was almost not at the house, so he didn't see. I did not see what happened. They don't have proof. They don't have any witness that saw what happened." Huitron argues that without this

11

conflict, Kraus would have been able to investigate further into this statement rather than just presenting it as newly discovered evidence. Kraus testified that the conflict "hamstrung me in several ways. For instance, ... I obviously could not talk to [Gomez] about her statement [at sentencing]. That was for all kinds of reasons and, frankly, had I been able to delve into that further, I would have actually been attacking [her trial attorney]'s representation at the sentencing." Because of this alleged conflict, Kraus said that he could only raise the statement by Gomez on appeal as "newly discovered evidence" which he believed was a very weak claim.

Gomez also testified at the habeas hearing. She said that Huitron did not kill their child and that she knows this because "[she] was there." When asked what had happened, Gomez recounted that a week before their child's death, Gomez dropped their child while bathing her, which caused her to hit her head hard against the bathtub.[3] Following that, "she was not acting normal."

---

[3] Gomez told a similar story when she was interviewed by law enforcement officers after Esmerelda's death.

After recounting this explanation of what happened, Gomez said, "I would say that … it's my fault … I'm sorry." Gomez went on to say that if someone had approached her about testifying about the bathroom incident and told her that it would cause the State to drop their charges against Huitron, she would have done so. According to her appellate counsel, who also testified at the habeas hearing, Gomez consistently claimed that Esmerelda's death resulted from an accident on her part and that Gomez never, even privately, admitted to intentionally killing her child.

After the hearing, the habeas court denied Huitron's habeas petition, concluding that Huitron "failed to establish an actual conflict of interest or that any conflict affected appellate counsel's performance." The court reasoned that the Clayton County Public Defender's Office never simultaneously represented Huitron and Gomez and that Huitron's trial and appellate counsel had no conflict because Kraus was a public defender and Huitron's trial counsel was privately retained. Further, Kraus called and questioned both Huitron's and Gomez's trial counsel at the motion for new trial

13

hearing despite his alleged concerns about a conflict and raised eight ineffective assistance of counsel claims against Huitron's trial counsel on direct appeal. The court also found that the record showed that Kraus aggressively pursued these claims.

And the habeas court determined that "Kraus could have raised a claim that Gomez was culpable by alleging ineffective assistance against [Huitron's] trial counsel – a retained attorney not employed by the public defender's office." The court thus concluded, alternatively, that, "even assuming a [potential] conflict existed because of Kraus' representation of [Huitron], [he] cannot show that such a conflict 'significantly and adversely affected counsel's representation of him.'"

2. Huitron contends that he should be permitted to have a new direct appeal with conflict-free counsel because his appellate counsel "suffered from a conflict of interest that prevented him from investigating whether Margarita Gomez committed the murder, or calling her to testify to what actually occurred in this case." Specifically, he claims that but for the conflict, his appellate counsel

would have asserted an ineffective assistance of counsel claim based on failing to raise the defense that Gomez solely committed the murder and that appellate counsel should have called Gomez as a witness to support that claim. We disagree.

"A criminal defendant in Georgia is constitutionally entitled to the effective assistance of counsel during his trial, motion for new trial proceeding, and direct appeal. One component of the right to the effective assistance of counsel is the right to representation that is free of actual conflicts of interest." *Hall v. Jackson*, 310 Ga. 714, 720 (2021) (cleaned up). To demonstrate ineffective assistance based on an actual conflict of interest, Huitron is "not required to prove that if [appellate counsel] had raised those claims, they would have had a reasonable probability of success;" he has the burden only to show that an "actual conflict of interest … significantly and adversely affected" Kraus's representation of Huitron. Id. at 723. "A *potential* conflict, however, is insufficient to impugn a criminal conviction." Id. at 721 (citation and punctuation omitted; emphasis in original). Instead, "for purposes of evaluating an ineffective

15

assistance claim, an actual conflict of interest means precisely a conflict *that affected counsel's performance* – as opposed to a mere theoretical division of loyalties." *Adams v. State*, 317 Ga. 342, 351 (2023) (cleaned up; emphasis in original). See also *Dills v. Weaver*, S25A1367, slip op. at 18 (2026) ("When evaluating a claim of ineffective assistance of counsel based on a conflict of interest, the critical question is whether the conflict significantly affected the representation, not whether it affected the outcome of the underlying proceedings." (cleaned up)). "The conflict must be palpable and have a substantial basis in fact." *Hall*, 310 Ga. at 721 (punctuation omitted; quoting *Lamb v. State*, 267 Ga. 41, 42 (1996)).

"When reviewing a habeas court's decision on a defendant's attorney conflict of interest claim, we accept the court's factual findings unless they are clearly erroneous, but we apply the law to those facts de novo." Id. at 719–20. "A habeas court's factual findings cannot be found to be clearly erroneous if there is evidence in the record to support such findings." *Smith v. Magnuson*, 297 Ga. 210, 212 (2015).

Here, even assuming that Huitron's appellate counsel had a potential conflict of interest, we agree with the habeas court's conclusion that any potential conflict did not significantly or adversely affect Kraus's representation of Huitron. While Kraus claimed that the conflict "hamstrung [him] in several ways," including not being able to "talk to [Gomez] about her statement," and that he was reticent about "attack[ing] somebody in [Kraus's] own office," the habeas-court record belies those assertions. See *Tolbert v. State*, 298 Ga. 147, 152 (2015) ("The trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony." (cleaned up)). Kraus questioned Schumaker extensively at the motion for new trial hearing. Moreover, Kraus raised eight ineffective assistance of counsel claims against Huitron's trial counsel, and nothing in the record supports why Kraus could not have asserted a ninth ineffectiveness claim based on the failure to raise the defense that Gomez was solely responsible for the murder.

It is also unclear what benefit Huitron claims would have been

17

gained by having Gomez testify. Huitron argues generally that, if not for the conflict, Kraus would have brought a claim that trial counsel was ineffective for not blaming Gomez enough at trial. But Huitron has not explained why Kraus needed Gomez's testimony to support that claim, because Huitron has not identified what specific deficiency of trial counsel could have been alleged in that claim that could be proven or supported by Gomez's testimony. The forgone claim could not have been that trial counsel should have called Gomez as a witness at trial: Gomez was a co-defendant, so she could not have been forced to testify. If not that, then what else should trial counsel have done differently? And how would Gomez's testimony have shown that trial counsel was deficient (and that Huitron was prejudiced)? Huitron does not say. Put simply, Huitron has not drawn a connection between appellate counsel's being 'hamstrung' by not being able to call Gomez and a specific ineffective assistance claim that appellate counsel was forced to forgo. And that is especially so since both Schumaker and Huitron's trial counsel "said that their main defense strategy at trial was to argue that the

cause of Esmerelda's injuries was an accident, and, to some extent, to try to deflect blame onto their client's co-defendant." *Gomez*, 301 Ga. at 451–52.

Moreover, at the habeas hearing, Gomez testified to a similar story that she told before trial – that Esmerelda was injured by accident in the bathroom, and her appellate counsel testified that at no point did Gomez admit that she committed the murder. There is no evidence that Gomez would have admitted killing Esmerelda intentionally if called at the motion for new trial hearing; to the contrary, the evidence presented at the habeas hearing was that she had never, even privately, admitted killing Esmerelda intentionally and only admitted "fault" based on the bathroom incident. Thus, Huitron has not shown how calling Gomez as a witness would have furthered the ineffective assistance of counsel claim such that the failure to call her as a witness did not significantly and adversely affect Kraus's ability to bring the ineffectiveness claim. See *Burger v. Kemp*, 483 US 776, 784–85 (1987) (affirming district court's conclusion that a conflict did not cause the lawyer to forgo a "lesser

19

culpability argument" as appellant counsel's decision to "forego [sic] [a lesser culpability argument] has a sound strategic basis" because "the process of winnowing out weaker claims on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy."); cf. *State v. Abernathy*, 289 Ga. 603, 604-05 (2011) ("A significant effect on the representation may be found, for example, where counsel is shown to have refrained from raising a *potentially meritorious* issue due to the conflict." (emphasis added)).

Furthermore, even assuming that Kraus was precluded from calling Gomez as a witness because she was a former client, Kraus did try to cast blame on Gomez without having her testify. He argued at the motion for new trial hearing that Gomez was an "exculpatory witness" due to the statement she made at sentencing that it was "[her] fault.". Additionally, the record shows that Kraus, at the motion for new trial hearing, acknowledged that there was evidence that "showed Ms. Gomez was more apt to have been the perpetrator than Mr. Huitron." And while he did not explicitly argue

20

that Gomez killed Esmerelda, Kraus also pointed out a lack of "congruity of intent" between Huitron and Gomez, as Huitron "was totally okay with the child" while Gomez was the one who did not like the child. This rebuts Kraus's testimony that he felt "hamstrung" in casting blame on Gomez due to any conflict based on his loyalty to Gomez as a former client. To the contrary, the evidence supports the habeas court's conclusion that the potential conflict did not compromise Kraus's representation. See *Abernathy*, 289 Ga. at 605 (concluding that there was no actual conflict where "the trial court expressly noted the absence of any evidence that the conflict 'colored counsel's actions during the trial'… Simply put, '[the appellant] has not shown in this case how his attorney's conflict caused divided loyalties [or] compromised his attorney's representation of him.'").

Because the habeas court's findings – that Kraus was not precluded by any potential conflict from asserting an ineffective assistance claim based on the defense that Gomez was solely responsible for the murder – are supported by the record, we

conclude the trial court was correct that the representation was not significantly or adversely affected by the potential conflict. See *Williams v. State*, 302 Ga. 404, 412 (2017) (no actual conflict of interest where the record did not indicate "that Appellant's counsel bypassed any meritorious defense… or that counsel's ability to cross-examine [the co-indictee] was constrained in any way" but rather that "Appellant's counsel conducted a vigorous cross-examination"). Cf. *Dills*, S25A1367, slip op. at 27 (concluding that trial counsel had an actual conflict of interest that adversely affected his representation because counsel represented both defendants before trial and learned that the co-defendant may have been solely responsible for the crime, but declined to assert that defense at trial, instead relying on a defense that was not supported by the evidence).

*Judgment affirmed. All the Justices concur.*